Gilbert L. MOBLEY, Plaintiff–Appellant,

v.

Donald D. COPELAND and Jan L. Copeland, Defendants–Respondents.

No. 17573.

Missouri Court of Appeals, Southern District, Division Two.

April 20, 1992.

---

Stephen L. Shepard, Shepard & Rahmayer, Springfield, for plaintiff-appellant.

Warren S. Stafford, Kevin M. FitzGerald, Taylor, Stafford, Woody, Cowherd & Clithero, Springfield, for defendants-respondents.

SHRUM, Presiding Judge.

The plaintiff, Gilbert L. Mobley, appeals from a summary judgment denying his claims for damages arising out of his purchase of residential real estate from the defendants Donald D. Copeland and Jan L. Copeland. Count I of the plaintiff's petition was based on allegations of fraud; Count III on allegations of a breach of an implied warranty of habitability.[1]

At issue on appeal is whether, considering the record before the trial court, there

---

[1]. The plaintiff's petition was in four counts. Under Count II, he sought punitive damages; Count IV was based on allegations of negligence. Given our disposition, any question regarding punitive damages is moot. On appeal, the plaintiff does not raise an issue regarding the propriety of summary judgment on the negligence claim. Thus the Count IV claim is deemed abandoned. *See Estate of Huskey v. Monroe,* 674 S.W.2d 205, 208 (Mo.App.1984).

exists a genuine issue of material fact concerning the plaintiff's allegations that the defendants made fraudulent representations or breached an implied warranty of habitability. We answer that question in the negative and affirm the judgment of the trial court.

## FACTS

From the pleadings, the May 24, 1990, depositions of plaintiff and both defendants, and other exhibits, the following facts emerge. The subject property, located in Springfield, was used by the defendants as their residence for 12 years. The defendants purchased the lot in 1973, and the following year they hired a contractor recommended to them by friends to build a house on the lot on a "cost-plus" basis. The house was constructed with a "crawl space" but no basement. Approximately one year after the house was completed, the defendants hired a contractor to install a swimming pool.

As of the date of his deposition, Donald Copeland had been a cookware and china retailer for approximately 35 years. In early 1989, he obtained a Missouri real estate broker license. He denied being a real estate developer. During the time the house was under construction, the defendants were, in Donald Copeland's words, "probably out there every weekend looking things over." Donald Copeland denied that he supervised construction of the house; at the time it was being built he was working 70 hours a week at his retail business. At the time the house was under construction, Jan Copeland was a homemaker. As of the date of her deposition, she had been employed in the travel agency business for seven years.

In May 1986, the defendants listed their property for sale at a price of $279,900

with real estate agent Ethel Curbow. The property was shown to the plaintiff by Donna Truitt, who was associated with a different real estate agency than was Curbow, and the plaintiff purchased the property through Truitt.

After the August 27, 1986, closing, the plaintiff discovered certain conditions of the property upon which he based his claims for damages. In his petition, he alleged that he discovered—after August 27, 1986—that (1) the house was constructed at a low elevation on the lot, the "landscaping around the residential dwelling was not terraced away from the foundation," and, as a result, "surface water run off from [the lot] was directed to and remained under the residential dwelling"; (2) "electrical charges ran through the swimming pool"; (3) "several air vents throughout the residential dwelling did not have air ducts leading outside"; and (4) "rain poured through the roof onto the interior walls of the residential dwelling." For convenience, we shall refer collectively to these alleged conditions as "the house problems."

Summarized, the plaintiff's argument for recovery under Count I is that the house problems were latent defects, the defendants knew of the defects, they had a duty to disclose the defects to him, but they failed to disclose them.[2] Disposition of the plaintiff's Count I claims requires the recitation of additional facts.

We begin with material extracted from the plaintiff's deposition and other exhibits. The plaintiff's initial contact with the property came during his first visit to Springfield, in June 1986, when he interviewed to join a group of physicians. As part of the interview process, he was shown the community by Truitt, a real estate agent,

---

**2.** The plaintiff admits there were no verbal or written representations by the defendants or by Ethel Curbow or Donna Truitt "about the construction of the house or anything like that." Indeed, the plaintiff never met or talked with the defendants or Ethel Curbow until after the parties had executed the purchase contract in July 1986. The parties' first contact with each other was at an early August 1986 meeting at which the parties signed an agreement concern-

ing second mortgage financing. At that meeting, the conversation was confined to the second mortgage, questions about the time required to mow the lawn and care for the swimming pool, the defendants' daughter's marriage, and the plaintiff's concerns about a lack of yard care by neighbors. Between the early August meeting and closing, the plaintiff spoke by telephone with each defendant at least once.

whose husband was a partner in the physicians' group. During the tour, Donna Truitt showed the defendants' property to the plaintiff. The defendants were not home at the time. On that first visit, the plaintiff could see "how beautiful it was, what a grand purchase it would be, how well kept it had been, the aesthetics of it were highly impressive." The plaintiff was uncertain whether he went inside the house on the first visit.

In early July 1986, the plaintiff returned to Springfield, apparently after receiving an offer to join the physicians' group. He and Donna Truitt again visited the defendants' home; again, the defendants were not present. After this second tour of the property, the plaintiff offered $200,000 to purchase it. The defendants rejected the plaintiff's offer but counter-offered to sell for $244,000. By a July 13 telegram to Donna Truitt, the plaintiff accepted the $244,000 counter-offer "as relayed by Donna Truitt." At deposition, the plaintiff insisted that his agreement to purchase the property was contingent on his "having the ability to verify that the house was worth the money on my own—my own appraisal."

Donna Truitt secured the services of a real estate appraisal firm for the plaintiff. The plaintiff told Truitt he wanted the appraisers to "make sure the house is worth the money. If the house has got any major problems, I needed to know about it and I was confident that an appraisal would take care of it."[3]

Although the plaintiff said he had the property "inspected" by the appraisers "to see if there are any problems with the house," he did not talk to them prior to the closing and he did not know whether he received a copy of their report prior to closing. Asked why he did not talk to them prior to closing, he said, "I was interested in the bottom line figure, and the bottom line figure was that I was not being taken; it was probably worth that value."

According to the appraisal, the market value of the property was $246,000.

At some point during the period between August 7 and the closing, the plaintiff telephoned the defendant Jan Copeland from his place of employment in Georgia to obtain information about utility companies. The plaintiff said Jan Copeland was "extremely upset" because an appraiser was at the house (or had recently been there) at a time when the house was not presentable because the defendants were "in the process of moving out," there were "boxes everywhere," and "all the pictures [were] off the walls."

The plaintiff went to the property a total of "four or five times" before closing. During his tours of the property, the plaintiff looked "everywhere that I knew to look...." He confirmed he "had an opportunity to look all around the house and the grounds, do anything you wanted to," and he agreed that no one prevented him from "checking anything that you wanted to."

The plaintiff characterized "two or three" of his visits as "invited, scheduled, be-sure-the-Copelands-are-gone" occasions, accompanied by real estate agent Truitt. One visit, already described, concerned second mortgage financing.

The plaintiff also visited the property—alone and in the absence of the defendants—twice on the day before closing, once in the afternoon and once in the evening. By that time, "everything had been taken out, except for a few dust piles in the garage." The plaintiff also discovered that the swimming pool "was approximately eight inches low on water and ... was being filled with a water hose."

When the plaintiff found the water level low, he called the owner of a swimming pool company. The plaintiff said that one of the conditions of closing was that the swimming pool "be certified as being in working order," and that the pool company he called was the one that was to provide

---

**3.** Despite the plaintiff's insistence that the purchase contract contained an appraisal or inspection contingency, we find no such contingency in the contract as it appears in the legal file. In their brief, however, the defendants appear to agree that the purported contingency was a part of the contract. Thus, we consider the contract to contain the contingency. *Nastasio v. Cinnamon,* 295 S.W.2d 117, 119[1] (Mo.1956).

that certification. The plaintiff learned the certification was limited to the pumping and filtration systems; the pool company had not checked the pool for leaks. The certification is not in the record, and we do not find the certification requirement in the contract.

Suspecting a leak in the pool, the plaintiff insisted that $1000 of the purchase price be escrowed to pay the cost of repair. After closing, another swimming pool firm repaired two leaks at a cost of $500, which was taken out of the escrowed funds.

Immediately after the closing, the plaintiff discovered in the master bedroom a water stain on the ceiling, warped, water-stained paneling on one wall, and water damage to trim molding and a built-in cabinet. The plaintiff said the damage was "not significantly worse" as of the date of his deposition than it was when he purchased the residence. He said that "on a scale of one to ten where one is barely noticeable; ten is noticeable.... It was a four when I bought the house. It might be a six now." The plaintiff estimated that from 10 to 20 square feet of paneling needed to be replaced.

The plaintiff had not previously noticed the damage because there was "a rubber tree plant adequately disguising the area." When he asked the defendant Donald Copeland about the damage, Copeland responded, "I've tried to correct this several times and worked and worked and even had people out looking at it. And it just seems to be a persistent leak type problem."

During the first month the plaintiff occupied the residence, he experienced a leak in the roof or chimney. Every time there was "a soaking rain," something more than "a simple shower," he could hear a dripping noise and see and feel moisture on the stained and warped portions of the wall and ceiling in the master bedroom. After several repair attempts by at least three roofing companies, the plaintiff said, "the situation is corrected."

In October or November 1986, the plaintiff went beneath his house to shut off the water supply to the outside faucets. He said it was at that time that he first learned "where the crawl space was, how to get into it...." Access to the crawl space was through a trap door in the back of a closet off the foyer. The plaintiff said that prior to October 1986 he had not known the house had a crawl space.[4] The plaintiff's experience with houses was limited to those with basements or those constructed on a concrete slab. He denied that prior to purchase he had seen the air vents in the foundation of the structure or that he had inspected the foundation walls for cracks "or anything like that." He said the vents were about 6 inches by 14 inches, painted the same color as the house, and obvious only "if you're looking for them."

Under the house, the plaintiff discovered a hole dug in the soil. The hole was full of water. The plaintiff estimated the dimensions of the hole to be six feet across and two and one-half to three feet deep. A system of trenches served to drain water from other areas beneath the house to the hole. Immediately above the hole was PVC piping which served to transport water from the hole to the lawn. There was no sump pump. The plaintiff estimated the height of the crawl space at three feet, although at certain points, such as when passing under ductwork, "you must get on all fours and scoot...." One photograph filed as an exhibit shows a man seated on a foundation footing with his feet in the hole and the upper portion of his body nearly erect.

When the plaintiff asked defendant Donald Copeland about his discovery beneath the house, Copeland told him "all the houses in this vicinity have this problem. This isn't anything to get excited about." Copeland told the plaintiff that ordinarily a sump pump was in the hole to empty the water onto the lawn, but the pump had broken, he had removed it to have it repaired, and he had forgotten to replace it.

---

4. On the standard form report completed prior to the closing by the plaintiff's appraisers, the box next to the words "crawl space" is marked with an "X"; the box next to the words "slab on grade" is not marked.

Water pumped from beneath the house and rain runoff from the lawn tended to flow toward the house and accumulate under it. The plaintiff attributed this phenomenon to the relatively low elevation at which the house had been built and the failure by the defendants to landscape around the house so as to terrace away from the foundation. The condition was "an optical illusion type deal.... It looks just perfectly fine, but when you certainly get the instruments out there, there is a big problem that's readily discernible."

The plaintiff did not use the swimming pool until June of 1987. In late June, while swimming near the metal pool ladder, the plaintiff experienced a sensation similar to an electrical charge. The sensation became more intense as he moved closer to the ladder. The plaintiff telephoned defendant Donald Copeland who told him, "You know, I never could figure out what made that ladder feel that way. Why, I've asked pool people and electricians what causes that, and the best we can figure out, it's a chemical problem."

Subsequent investigation by the electric cooperative and several private electricians confirmed the presence of an electrical charge in the pool. The plaintiff said that apparently there was "a broken neutral ground somewhere in the neighborhood" and that the swimming pool "acted as a ground to the entire neighborhood."

The plaintiff contacted the firm that had appraised the property for him because "I wanted to know how [the house problems] would change the appraisal, had [the appraisers] been as diligent as I expected them to be in looking for problems." The plaintiff said the appraisers told him that 1986 "was the hottest, driest summer in recent history. The crawl space was dry at that time. They did not crawl in the crawl space; they peered into it." The plaintiff said the appraisers also told him:

They did not take a volt meter to the swimming pool ladder. They did not swim in the swimming pool. They did not inspect the premises during a light shower to see the flow of water under the premises.... [T]hey didn't move a

rubber tree in a corner of a master bedroom to show the presence of a water leakage.

The appraisers revisited the property and then sent the plaintiff a letter in which they stated, in part:

When we appraised your property ... on August 22, 1986, there was no dampness in the crawl space observed or was there any disclosure made to us that there was a water problem.

At your request a visit was made by us to your property on July 23, 1987. It was observed at this time that there is a problem, apparently caused by surface water coming down and under the house and into the crawl space.

....

In your case, had the problem been apparent or disclosed at the time of the appraisal, the indicated value would have been made subject to the water problem being corrected.

In his deposition, the plaintiff offered no evidence concerning his allegation that several vents were not connected to the house's ductwork, other than to state that certain "experts" had advised him of the existence of unconnected vents. The plaintiff had experienced no problems heating or air conditioning the house other than "the system design being rated extremely inefficient by City Utilities R-factor expert...."

The Copelands' depositions provide additional facts. Shortly after the house was completed, Donald Copeland discovered water standing beneath the house after "a very hard rain." Although the water would "go away in a few days," Copeland hired someone to dig the hole and trenches and install the sump pump. Copeland told the plaintiff there was a sump pump beneath the house "when he was doing his final walk-through ... sometime before closing."

Donald Copeland also used the sump pump annually to drain the swimming pool so it could be cleaned. Approximately one week before the closing, Copeland took the sump pump from beneath the house and used it to lower the water level in the pool so that a leak in the water supply line to

the pool could be repaired. The sump pump broke, and Copeland took it to a repairman. As of the date of the closing, the sump pump had not been put back under the house.

Concerning the allegations of an electrical current in the swimming pool, both defendants said they had experienced "tingling" sensations near the pool ladder. The Copelands used the pool "regularly" and the tingling occurred over a period of "several years," but only in the late summer. Donald Copeland "inquired with different pool companies" about the tingling. One company suggested the cause of the tingling sensation might be improperly mixed chemicals. The defendants altered their chemical use, an action Donald Copeland said "seemed to help" the situation. Jan Copeland said that after a change of pool chemicals, they did not experience the tingling. Donald Copeland identified the company, Springfield Pool (defunct as of the date of deposition) that suggested the cause of the tingling was chemical, he identified an existing company that was "an offshoot" of Springfield Pool, and he identified the operators of each company.[5] The operator of the "offshoot" company was the son of the operator of Springfield Pool.

Both defendants specifically disclaimed any knowledge that the "tingling" sensation was caused by electrical currents. Jan Copeland repeatedly stated that she had allowed her grandchild to be in the pool and would not have done so had she known that electrical currents were the cause of the tingling.

Jan Copeland disclaimed any knowledge that some of the vents were not connected to the duct work. She said that the heating bill "was not high at all for the house." She acknowledged that the roof had leaked at one time but she said she and her husband had hired someone to repair the roof and, following that repair, it no longer leaked. She could not recall when the roof was repaired, but she said it "could have

been" as long as three years before they sold the house to the plaintiff.

Jan Copeland said the stains in the bedroom from the leak were "quite evident at the time the house was sold. They were not covered with anything." She did not recall a rubber tree in the master bedroom. At the time of the sale, a eucalyptus and a schefflera were in the room, but neither went more than halfway up the wall to the nine- to ten-foot ceiling. Donald Copeland stated at his deposition "there was nothing covering up a stain."

Concerning the appraisers' inspection over which she was (in the plaintiff's words) "extremely upset," Jan Copeland said she arrived home one day to find "three cars there and people in various parts of the house." The persons there were real estate agents Curbow and Truitt and "one or two inspectors, I do not know." The inspector or inspectors "were in the barn and all over the house."

On May 7, 1991, the trial court conducted a hearing on the defendants' summary judgment motion and entered the judgment from which the plaintiff now appeals.

## STANDARD OF REVIEW

Summary judgment is governed by Supreme Court Rule 74.04, which provides in pertinent part:

> [Summary judgment] shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In the trial court, the burden is on the party moving for summary judgment to demonstrate there is no genuine issue of material fact. *Gast v. Ebert*, 739 S.W.2d 545, 546 (Mo. banc 1987). However, the party opposing summary judgment "may not rest upon mere allegations or denials, but must ... by affidavits or otherwise, set forth specific facts" to show the existence

---

5. The "offshoot" pool company was the one the plaintiff called prior to closing when he discovered the lowered water level in the pool.

**724**

of a genuine issue of material fact. *St. Charles County v. Dardenne Realty Co.,* 771 S.W.2d 828, 830 (Mo. banc 1989). Facts alleged in support of a motion for summary judgment are deemed admitted and taken as true where the party opposing summary judgment fails to file a verified denial or a counter-affidavit. *Seliga Shoe Stores v. City of Maplewood,* 558 S.W.2d 328, 331 (Mo.App.1977).

"Mere doubt" and "speculation" do not create a genuine issue of material fact. *Id.* "Material facts" are those which are of such probative value that they would control or determine the litigation. *Wood & Huston Bank v. Malan,* 815 S.W.2d 454, 457 (Mo.App.1991). Thus "the record must demonstrate a factual question that would permit a reasonable jury to return a verdict for the non-moving party." *Id.*

Contrary to the plaintiff's assertion, since the deletion of subsection (h) from Rule 74.04, it is no longer necessary that a summary judgment motion be supported by "unassailable proof." *Defino v. Civic Center Corp.,* 780 S.W.2d 665, 667 (Mo.App. 1989). However, the right to summary judgment "must clearly appear as a matter of law." *Schwartz v. Lawson,* 797 S.W.2d 828, 832 (Mo.App.1990).

Because summary judgment is "an extreme, drastic remedy," on review we examine the record in the light most favorable to the party against whom the judgment was entered, *Zueck v. Oppenhiemer Gateway Properties,* 809 S.W.2d 384, 385–86 (Mo. banc 1991), and we accord to that party all reasonable inferences which may be drawn from the evidence. *Gast,* 739 S.W.2d at 546. Nevertheless, an order granting summary judgment is not presumptively erroneous; thus, as a matter of general law, the burden is on the appealing party to demonstrate error. *Cain v. Hershewe,* 777 S.W.2d 298, 300 (Mo.App.1989).

## DISCUSSION AND DECISION

*Plaintiff's Count I (Fraudulent Misrepresentation)*

In his first point on appeal, the plaintiff challenges the trial court's summary disposition of Count I, which was based on his allegations of fraud.

The elements of a submissible case of fraudulent misrepresentation are set out succinctly in *Gast:*

(1) a false, material representation; [6]

(2) the speaker's knowledge of its falsity or his ignorance of its truth; [7]

(3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated;

(4) the hearer's ignorance of the falsity of the statement;

(5) the hearer's reliance on its truth, and the right to rely thereon; and

(6) proximate injury.

739 S.W.2d at 547. Failure by a plaintiff to establish any one of the foregoing elements of fraud precludes recovery. *Dolan v. Rabenberg,* 360 Mo. 858, 231 S.W.2d 150, 154 (1950); *Wion v. Carl I. Brown & Co.,* 808 S.W.2d 950, 953 (Mo.App.1991).

6. An affirmative representation is not always required for actionable fraud to exist. Silence can add up to misrepresentation if the silent party has a duty to speak. *Jones v. Arnold,* 359 Mo. 161, 221 S.W.2d 187, 193 (1949); *Centerre Bank of Independence v. Bliss,* 765 S.W.2d 276, 284 (Mo.App.1988). The duty to speak up may arise when the silent party is a fiduciary or where special confidence is expressly reposed in the silent party. *Vendt v. Duenke,* 210 S.W.2d 692, 699 (Mo.App.1948); *Bliss,* 765 S.W.2d at 284. The plaintiff does not suggest the existence of fiduciary relationship or a special confidence between the parties, and there is no evidence that would support such a claim.

However, a duty to disclose may arise from other circumstances, such as inequality of condition or "the superior knowledge of one party,

which knowledge is not within the fair and reasonable reach of the other party. Whether or not a duty to disclose exists and whether or not the circumstances amount to fraud must be determined on the facts of the particular case." *Jones,* 221 S.W.2d at 193.

7. " 'To recover for fraudulent representations, it is not necessary that it be shown that defendant had actual knowledge of the falsity of the facts stated by him. It is sufficient that he made the representations with the consciousness that he was without knowledge as to their truth or falsity, when, in fact, they were false.' " *Ackmann v. Keeney–Toelle Real Estate Co.,* 401 S.W.2d 483, 489 (Mo. banc 1966) (quoting *Wilson v. Murch,* 354 S.W.2d 332, 338–39 (Mo.App. 1962)).

The essence of the plaintiff's legal argument is that a seller of real estate who has knowledge of latent, material, physical defects in the property has a duty to disclose those defects to a buyer, and that a buyer's independent inspection does not relieve the seller of the duty to disclose. Dispositive factual issues concern the defendants' knowledge of certain of the "house problems" and whether certain of the "house problems" were latent.

■ We examine separately each of the "house problems" to determine if summary judgment was appropriate. Concerning unconnected air vents, the plaintiff presented no evidence that the defendants were aware of this condition. Jan Copeland specifically disavowed knowledge of unconnected vents and said she and her husband had not incurred abnormal utility bills. There exists no genuine issue of material fact concerning the defendants' knowledge of unconnected air vents.[8]

■ Concerning the electrical charges in the swimming pool, the plaintiff appears to argue that the combination of the defendants' experience of the tingling sensation in the pool, their failure to tell the plaintiff about the tingling sensation, and the plaintiff's subsequent discovery of electrical current in the water necessarily establish a submissible case of fraudulent misrepresentation. This argument appears based on the unstated presumption that the defendants knew the tingling sensation was electrical in nature. The plaintiff's argument fails, however, because fraud is not to be presumed, and an inference of fraud is insufficient to support a claim of fraudulent misrepresentation. *Callicoat v. Acuff Homes, Inc.*, 723 S.W.2d 565, 568 (Mo.App. 1987). Moreover, a review of the record makes clear there is no genuine issue of material fact concerning the defendants' knowledge about whether the tingling was caused by electrical current.

Both defendants specifically denied any knowledge that the "tingling" sensation they experienced was electrical in nature. From their inquiry of at least one pool company, they had concluded the tingling was a result of chemical imbalance in the water. Both defendants said the tingling sensation abated following a change of chemicals. At deposition, Donald Copeland identified the pool company upon whose diagnosis he relied, he identified an "off-shoot" pool company, and he identified the operators of each. As of the date of the hearing on the summary judgment motion, nearly one year after the defendants' depositions were taken, the plaintiff had offered no evidence to contradict the defendants' disclaimers of knowledge about an electrical current in the pool or their acceptance of the pool company's explanation of the cause of the tingling sensation. Absent a verified denial or counter-affidavit, the defendants' lack of knowledge about the presence of an electrical current in the pool is deemed admitted. *Seliga Shoe Stores*, 558 S.W.2d at 331.

In his argument that the "house problems" were material ones, the plaintiff restricts his discussion about the pool to the electrical nature of the tingling sensation. However, in his discussion concerning the defendants' purported duty of disclosure, he complains that they did not tell him "about any kind of problem with the pool." Concerning this argument, we find significant the defendants' uncontradicted testimony that they continued to use the swimming pool, despite their experience of the tingling sensation; that pool company personnel told them the tingling was the result of chemical imbalance; that changing the pool chemicals alleviated the tingling; and that Jan Copeland permitted her grandchild to swim in the pool. We believe this to be evidence that the defendants had no knowledge that the tingling sensation, in and of itself, was a "problem" of such materiality

---

**8.** The plaintiff's only complaint at deposition about the heating and air conditioning system concerned its inefficient design. Thus, from the plaintiff's testimony, it would be reasonable to conclude the unconnected vents did not consti-

tute a material problem, despite the plaintiff's assertion in his brief that they "gravely affected both the value and the desirability of the property [to him]."

that they were required to disclose it to the plaintiff.

It is not disputed that the defendants knew about the water beneath the house and the damage in the master bedroom from a leak in the chimney or roof. The existence of a leak itself was disputed, however, the defendants claiming it had been repaired and the plaintiff asserting it had not. However, resolution of this appeal as it relates to these three "house problems" turns not on the defendants' knowledge but on whether there is a factual issue about other elements of the plaintiff's fraud claim.

The plaintiff's argument concerning the water beneath the house and the roof leak is based on an assumption that they were latent defects. Because the defendants "had knowledge of these latent defects," the argument goes, they were under a duty to disclose their existence to the plaintiff.

■ No defect is latent if it is "discoverable by the exercise of due care" or "reasonable diligence." *Edwards v. Springfield Coca–Cola Bottling Co.*, 495 S.W.2d 489, 497 (Mo.App.1973). This description of a latent defect is consistent with the pronouncement, *supra* note 6, that a party with superior knowledge has a duty to disclose that knowledge if it is "not within the fair and reasonable reach of the other party." *Jones*, 221 S.W.2d at 193. The burden is on the party claiming fraudulent nondisclosure to show the undisclosed information was beyond his reasonable reach and not discoverable in the exercise of reasonable diligence. *Fairmont Foods Co. v. Skelly Oil Co.*, 616 S.W.2d 548, 550–51 (Mo.App.1981). *See also Noss v. Abrams*, 787 S.W.2d 834, 837 (Mo.App. 1990).

■ The plaintiff points to no evidence that would create a genuine issue of material fact about whether knowledge of the water beneath the house was within his "fair and reasonable reach." The defendant Donald Copeland testified at deposition that he told the plaintiff prior to closing that there was a sump pump beneath the house. Nothing in the plaintiff's deposition rebuts this assertion by Donald Cope-

land, and the plaintiff subsequently offered no verified denial or counter-affidavit concerning Copeland's statement. The plaintiff's knowledge of the existence of the sump pump is deemed admitted. *Seliga Shoe Stores*, 558 S.W.2d at 331. Moreover, his knowledge of the existence of the pump put him on notice of a need for a pump. Due care and reasonable diligence would require the plaintiff to inquire further. *Edwards*, 495 S.W.2d at 497.

■ There is another reason why the plaintiff cannot prevail concerning the water beneath the house. Assuming, for argument sake, the defendants had a duty to disclose the presence of water beneath the house, there could be no fraudulent nondisclosure because the plaintiff did not rely on their silence. "It has long been the rule in this state that latent defects cannot be made the subject of misrepresentation where, as here, the buyer has inspected the property involved." *Riley v. White*, 231 S.W.2d 291, 298 (Mo.App.1950) (citing *Morse v. Rathburn*, 49 Mo. 91, 93 (1871)). When a party makes an independent investigation he is presumed to have relied on what he learned from that investigation and may not claim that he relied on a misrepresentation. *Martin v. Brune*, 631 S.W.2d 77, 80 (Mo.App.1982).

■ Not only did the plaintiff conduct extensive personal examinations of the property, examinations in which he was given virtual "free rein," he hired an appraisal firm "to see if there are any problems with the house." The appraisers "peered into" the crawl space; they did not enter it. We know from the plaintiff's testimony and photographs of the crawl space that, had the appraisers entered the crawl space, the reservoir and system of canals and PVC pipe would have been readily apparent. Even if the plaintiff had not been advised of the existence of the sump pump beneath the house, because of his appraisers' inspection and the report they prepared prior to closing, he cannot now disclaim awareness of the existence of a crawl space and the presence of the wa-

ter collection and removal system beneath the house.

■ We turn now to the evidence related to the plaintiff's allegation that "rain poured through the roof onto the interior walls of the residential dwelling." We point out that our earlier recitation of evidence that the roof leaked beyond the date the defendants claimed they had it repaired is the result of our independent reading of the record. Rule 84.04(h) requires specific page references to the legal file or the transcript to support assertions of fact. Page references are to appear in the statement of facts and the argument. *Liddle v. Collins Const. Co.*, 283 S.W.2d 474, 479 (Mo.1955). With regard to the claim that the roof did, indeed, leak, the plaintiff has attempted to comply with Rule 84.04(h) by making reference to two pages in the transcript of the summary judgment hearing. When we turn to those transcript pages, we find the plaintiff's attorney's argument to the trial court concerning a roof leak. It is axiomatic that an attorney's argument is not a substitute for evidence.

The plaintiff's failure to identify the location in the record of evidence of a roof leak would justify affirming on this particular issue without additional consideration. Rule 84.13(a); *State ex rel. Missouri Highway and Transp. Comm'n v. Pipkin*, 818 S.W.2d 688, 690 (Mo.App.1991). Indeed, this court has no obligation to "seine through transcripts to learn whether alleged errors exist...." *Kasper v. Helfrich*, 421 S.W.2d 66, 71–72 (Mo.App.1967). *See also Peters v. Dodd*, 328 S.W.2d 603, 609 (Mo.1959). We have, however, conducted an independent inquiry, reading the entire record several times, and we proceed to resolve the matter on the merits.

The plaintiff's argument concerning a leaking roof may be summarized: a leaking roof is material to a real estate transaction; the defendants knew about the leak; because the leak was a latent defect the defendants were obligated to disclose its existence to the plaintiff; the defendants did not so disclose. From his deposition testimony and the statement of facts portion of his brief, it is obvious the plaintiff views the stains and warping as evidence of a leak in the roof. We agree with the plaintiff; from the facts in the record, the alleged roof leak was inextricably linked to the water stains and warped wood and discovery of the stains and warping would have alerted him to the existence of a leak, present or past, and he could have inquired further.

The plaintiff's argument fails, however, because there is no factual issue concerning the latency of the water stains and warped wood. Despite his statement that a rubber tree was "adequately disguising the area," the plaintiff admitted that, at the time he purchased the property, the damage was "a four" on a scale of one to ten where "one is barely noticeable; ten is noticeable...." Given this admission and the free rein the plaintiff and his appraisers had to inspect the house, the failure to discover evidence of a leak was the result of a failure to exercise due care or reasonable diligence. *See Edwards*, 495 S.W.2d at 497.

There was no genuine issue of material fact concerning any of the "house problems." The trial court did not err in entering summary judgment in favor of the defendants on Count I.[9]

*Plaintiff's Count III (Implied Warranty of Habitability)*

■ In his second point on appeal, the plaintiff contends the trial court erred in granting summary judgment on his Count

---

**9.** The plaintiff relies on *Miller v. Higgins*, 452 S.W.2d 121 (Mo.1970); *Barylski v. Andrews*, 439 S.W.2d 536 (Mo.App.1969); and *Vendt*, 210 S.W.2d 692, as controlling authority for his argument that the defendants, possessing superior knowledge, had a duty to disclose the existence of the various "house problems." The plaintiff's cases do not control. *Miller* and *Barylski* involved intentional concealment which put the material facts beyond the reasonable reach of the plaintiffs and rendered futile their exercise of reasonable diligence. In *Vendt*, the undisclosed material fact—the nature of the soil and the lack of footings beneath the foundation— was such that the defendant developer-vendor was charged with knowledge of the defective conditions while the plaintiff purchasers could not be charged with constructive knowledge of the defects.

III, which alleged a breach of an implied warranty of habitability, a theory of recovery first recognized by the Missouri Supreme Court in *Smith v. Old Warson Development Co.*, 479 S.W.2d 795 (Mo. banc 1972).[10] In *Old Warson*, the court announced a limited departure from a strict application of the doctrine of *caveat emptor* and held that a common law warranty of habitability to protect against latent structural defects will be implied in law in favor of the first purchaser of a new home from a builder-vendor. *Old Warson*, 479 S.W.2d at 796 and 801; *O'Dell*, 560 S.W.2d at 870.

We need not analyze each problem to determine whether it constituted a structural defect as that term is used in, for example, *San Luis Trails Ass'n v. E.M. Harris Bldg. Co.*, 706 S.W.2d 65, 68–69 (Mo.App.1986), and *Schulze v. C & H Builders*, 761 S.W.2d 219, 222–23 (Mo.App. 1988). Nor must we deal with the plaintiff's argument that the house, which the defendants used as their residence for 12 years, was "new" as that term was construed in *Snowden v. Gaynor*, 710 S.W.2d 481, 485–86 (Mo.App.1986) ("Several months" elapsed from the time the house was completed until it was sold, and the house was occupied during the winter while it sat unsold.).

We believe resolution of the plaintiff's Point II turns on whether there is a genuine issue of material fact about the defendants' status as builders-vendors. To examine such status, we turn again to *Old Warson* in which the supreme court made clear the implied warranty of habitability would be "applicable only against that person who not only had an opportunity to observe but failed to correct a structural defect, which, in turn, became latent, i.e., the builder-vendor." 479 S.W.2d at 801.

In *Allison v. Home Savings Ass'n of Kansas City*, 643 S.W.2d 847 (Mo.App.

1982), the court was faced with the issue of whether a lending institution might be charged with liability as a builder-vendor under the *Old Warson* doctrine. The court pointed out there was no evidence about the lending institution's involvement in the pre-construction phase of the project other than financing and no evidence of its "opportunity to observe or actual knowledge of construction defects." 643 S.W.2d at 851[3]. The court held that, on the record before it, the lending institution could not be liable for damages on the theory of a breach of an implied warranty of habitability. *Id.*

Had the evidence about the lending institution's involvement in the project been otherwise, the result in *Allison* might have been different. As the court noted:

> Of course a defendant need not personally perform the actual construction in order to be held liable. A developer who causes houses to be built for the purpose of sale to the public will be held to be a builder-vendor, since purchasers from a developer-vendor depend on his ability to hire a general contractor capable of constructing a sound residence.

643 S.W.2d at 851 n. 1.

The extent of the seller's involvement in the actual construction of the house and his occupational status as a developer are not the only factors to consider in determining whether the seller is also a "builder." Of the deteriorating house in *Old Warson*, the court noted, "At the time of building [it] it was defendant's intention to sell it after using it for publicity purposes." 479 S.W.2d at 797. And, "The home here was new and was purchased from the company which built it for sale." *Id.* at 799. In the passage quoted above, the *Allison* court suggested it would apply the implied warranty doctrine to developers of houses "built for the purpose of sale to the public...." 643 S.W.2d at 851.

**10.** In the *Old Warson* opinion, the words *fitness, quality, merchantability,* and *habitability* are used interchangeably. The warranty imposed in *Old Warson* is analogous to the implied warranty of merchantability found in the Uniform Commercial Code (RSMo § 400.2–314). *O'Dell v. Custom Builders Corp.*, 560 S.W.2d 862, 870 (Mo. banc 1978). In other words, for purposes of *Old Warson, habitability* is to new homes what *merchantability* is to goods. *Id.* at 870–71. *See also* Karen Lee Schneider, Comment, *Recent Developments in Implied Warranty Actions for the Sale of New Homes,* 50 Mo.L.Rev. 377, 385–86 (1985).

Courts in other states agree that application of the warranty is limited to houses "built for the purpose of sale to the public." Thus it is essential that the sale be "commercial rather than casual or personal in nature." *Klos v. Gockel*, 87 Wash.2d 567, 554 P.2d 1349, 1352[1] (en banc); *Mazurek v. Nielsen*, 599 P.2d 269, 271[4] (Colo.App.1979). In *Mazurek*, the court pointed out that "a first-time builder-seller may be 'in the business of building' for purposes of impliedly warranting his work, if his primary reason for constructing the house is to resell it." 599 P.2d at 271[4].

The plaintiff points to no evidence that creates a factual issue concerning the extent of the defendants' involvement in the construction of the house, their status as developers, or their intention when they had the house erected that it be built for purposes of resale. The plaintiff's entire argument on the issue is this single sentence: "There is no dispute that the Defendants were the builders and sellers of the property (L.F. 57, 154)." When we turn to the plaintiff's references to the legal file, however, we find deposition testimony from Donald Copeland and Jan Copeland, respectively, that they hired contractors to build the house and the swimming pool. How this testimony establishes that the defendants were "builders" eludes us.

From our independent review of the record, we learn that at all times relevant to the construction of the house and its sale to the plaintiff, the defendant Donald Copeland was a cookware and china retailer and the defendant Jan Copeland was a homemaker and travel agent. Donald Copeland specifically denied being a real estate developer, and he denied that he "supervised" construction of the house. The defendants used the property as their personal residence for 12 years; there is no evidence they built the house "for the purpose of sale to the public." The plaintiff offered no verified denial or counter-affidavit on any of these matters; they are deemed admitted. *Seliga Shoe Stores*, 558 S.W.2d at 331. The plaintiff's failure to show a factual issue concerning the defendants' status as "vendors-builders" within the meaning of *Old Warson* is fatal to his claim.

The trial court did not err in entering summary judgment in favor of the defendants on Count III.

We affirm the judgment.

FLANIGAN, C.J., and PARRISH, J., concurs.