DECISION
The present case was heard by the court sitting without a jury on June 19, 20, 21, and 22, 1995. Decision is rendered herein.
Facts
The plaintiffs, David and Elodie McAllister, purchased a house from the defendants, Charles and Barbara Cook. The McAllister claim that the house contained significant defects which the defendants failed to disclose. As a result, the plaintiffs seek recovery based on six different theories.
The defendants originally listed the property through the Multiple Listing Service (M.L.S.). Located at 5 Spinnaker Drive in Barrington, the property was listed at a price of $1,250,000. The plaintiffs initially viewed the home with Mimi Price, an agent for Coleman Realty, in late June of 1989. During that visit they also spoke with Rosemary Cournoyer, another listing agent. When Elodie McAllister inquired about the house's elevated electric costs as reflected in the M.L.S., Ms. Cournoyer explained that Barbara Cook kept the temperature at approximately 80 degrees in an effort to reduce allergy problems. Because the home's heating system was comprised of solar heat with electric back-up, Ms. Cournoyer explained, the electric bills were significantly higher than those of typical homes.
The plaintiffs met Barbara Cook at the close of their second visit, approximately one week later. During this visit Mrs. Cook showed Mrs. McAllister blueprints of the house with her instructions to an electrician who had taken over the task after the defendants "fired" Solar Structures, Inc., the entity the defendants had hired as the original contractor for the property. On the third visit in late July, the plaintiffs met with both defendants for the purpose of asking technical questions about the house including the exhaust system for the swimming pool area, the heat set backs, and the intercom. On this visit or a .later visit, Mrs. Cook provided the plaintiffs with a twelve (12) page "fact sheet" detailing the home and its contents. (Exhibit 1, Full).
It was during these visits that the defendants discussed their involvement in the construction of the house. While the defendants hired Solar Structures, Inc., to construct the property, Mrs. Cook spoke of her role in performing clerical tasks for that entity. Specifically, Mrs. Cook stated that she dealt with the bank, obtained lien releases, and paid bills, among other contributions. In addition, both defendants claimed to have played a major role in the original design of the home and even oversaw the completion of the project when Solar Structures was terminated.
Prior to making an offer on the property, the plaintiffs retained Anthony Nunes, a building contractor, to inspect the home. Mr. Nunes performed some work on the house for the defendants after they fired Solar Structures. He and Mrs. McAllister spoke about the heating system, at which the time Mr. Nunes suggested that the plaintiffs could "throw in some gas" to reduce the heating costs. The discussion did not address the fact that the heating system did not work, however.
The plaintiffs subsequently offered $900,000 for the house and the parties eventually agreed on a purchase price of $1,150,000. The Purchase and Sale Agreement was signed in late August of 1989, and the closing occurred approximately one month later. The plaintiffs moved into the home of September 29, 1989.
It was during the Thanksgiving holiday in 1989 that the plaintiffs first noticed a problem keeping the house warm. In anticipation of out-of-state relatives' visiting, the plaintiffs turned on the electric heat in all living rooms on the first floor and all bedrooms. This was the first time that the plaintiffs had turned on the heat in these areas. Approximately twelve hours after turning on the heat, however, the house remained cold with the temperatures between 50-60 degrees in some of the open rooms, and near 68 degrees in closed rooms such as the bedrooms. Twenty-four hours after the heat was turned on, the plaintiffs and their guests were still wearing sweaters and heavy winter clothes in an effort to combat the cold.
During this winter, Elodie McAllister contacted Barbara Cook about the problems with the house's heating system. Mrs. Cook told her that gas heat was needed to keep the house sufficiently warm. The plaintiffs began contacting heating contractors in the spring in an effort to remedy the situation. They eventually hired Martin Israelit to install a new Heating. Ventilation and Air Conditioning (HVAC) system. Fred Flanagan was also hired to perform the necessary carpentry work. Both agreed that electric heat was impractical given the size of the home.
The plaintiffs subsequently decided to install top-of-the-line HVAC system that included air conditioning. The total cost was approximately $192,000.[1] Mr. Flanagan testified that in the process of doing the necessary carpentry work to install this system, he discovered several defects which increased the cost of repair.
The plaintiff claim that the minimum expenses resulting from the defective conditions were $193,500.
Caveat Emptor
Caveat emptor remains the general rule in the sale of real estate, both in Rhode Island and beyond. See Hydro-Manufacturing.Inc. v. Kayser-Roth Corp., 640 A.2d 950, 956 (R.I. 1994)[2];See also 1 Friedman, Contracts and Conveyances of Real Property,
§ 1.2(n) at 42 (5th ed. 1991). Several exceptions to this rule exist, however, and it is upon these exceptions that the plaintiff in this matter seeks recovery. The plaintiff has stated a six count complaint, seeking relief for breach of the implied warranty of fitness, breach of the implied warranty of merchantability, breach of the implied warranty of habitability, breach of express warranty, breach of contract, and fraud. Each relevant count is fully addressed herein.[3]
Implied Warranty of Habitability
In Padula v. J. J. Deb-Cin Homes, Inc., 111 R.I. 29,298 A.2d 529 (1973), the court "adopt[ed] the doctrine that where a builder-vendor sells a house, either new or under construction, he implicitly warrants that the construction has been or will be done in a workmanlike manner and that the dwelling will be reasonably fit for human habitation." Id. at 32, 298 A.2d at 531. In order for the warranty to issue, however, it is necessary that the seller of the house be a "builder-vendor," for "there is no basis . . . to extend the warranty to cover the sale of a used home by a nonbuilder-vendor." Sousa v. Albino, 120 R.I. 461, 464,388 A.2d 804, 805 (1978). This distinction is
 "based upon the premise that, with respect to the sale of new homes, the purchaser has little choice but to rely upon the integrity and professional competence of the builder-vendor. The public interest dictates that if the construction of a new house is defective, its repair cost should be borne by the responsible builder-vendor who created the defect and is in a better economic position to bear the loss, rather than by the ordinary purchaser who justifiably relied upon the builder's skill. Id. at 464, 388 A.2d at 805 (citing Schipper v. Levitt Sons, Inc., 44 N.J. 70, 91, 207 A.2d 314, 326 (1965))."
The plaintiffs argue that the circumstances present in the instant case require that the court deem the defendants "builder-vendors" and consequently find that a breach of the implied warranty of habitability has occurred. While the plaintiffs concede that the defendants did not construct the house themselves, they point to the defendants' participation in the design the property as well as the fact that the defendants performed all clerical and business aspects of the general contractor. Moreover, plaintiffs argue, the fact that the defendants purchased builder's risk insurance and eventually workers' compensation insurance suggests that the defendants were the builder-vendors on the project.
The defendants reject such a conclusion, arguing that their inclusion in the definition of "builder-vendor" effectively "makes a mockery of the term." While acknowledging their status as the vendors of the home, the defendants contend that Solar Structures and Anthony Nunes were the builders. Because the defendants were not the builders, they conclude, that they may not be held liable for a breach of the implied warranty of habitability because no such warranty ever issued.
While the Rhode Island Supreme Court has not set forth guidelines relevant to the determination of "builder-vendor" status, several other courts have addressed the issue. The primary consideration in these courts' analyses involves whether the sale was commercial rather than casual or personal in nature.See. e.g., Mobley v. Copeland, 828 S.W.2d 717, 729 (Mo. App. 1992); Klos v. Gockel, 554 P.2d 1349, 1352 (Wash. 1976); Bolkumv. Staab, 346 A.2d 210, 211 (Vt. 1975).[4] A sale is commercial if the home was built for the purposes of resale to the public.Mazurek, 599 P.2d at 271; Mobley, 828 S.W.2d at 729; Klos, 554 P.2d at 1352.
The plaintiffs' arguments on this matter do not compel a finding that the questioned sale was commercial in nature. The fact that defendant Barbara Cook may have performed clerical duties or even contacted subcontractors on behalf of Solar Structures, Inc. is not controlling on the issue of the nature of the sale. See Klos, 554 P.2d at 1352 (fact that seller acted as her own general contractor does not transform transaction into commercial sale).
The facts in this matter do not indicate or suggest that the transaction at issue was anything other than a personal sale of real estate. The defendants were not "builder-vendors" and therefore the implied warranty of habitability does not attach. As a result, the plaintiffs' claim on this theory must fail.
Breach of Contract
The plaintiffs also seek recovery on a breach of contract theory. They premise their argument on paragraph five of the Agreement. That section provides, in relevant part:
 "CONDITION OF THE PREMISES. Sellers shall deliver to Buyers, at the time of the Closing hereinafter provided, full possession of the Premises free of any tenants . . . (b) not in violation of any applicable laws, codes, ordinances, rules, regulations, restrictions, decrees, orders or standards including without limitation, zoning ordinances, subdivision laws, environmental laws, plat restrictions, fire code and building code. . ."
The plaintiffs argue that the premises as actually delivered contained a heating system in violation of the applicable building code. As a result, they seek recovery for the defendants' breach of the Agreement.
The defendants contend that the plaintiffs' exclusive remedy for breach of the Agreement lies in paragraph eight. That section reads:
 "REMEDIES IN CASE OF DEFAULT
 8.1. If Sellers shall be unable to give title or to make conveyance as required by this Agreement (it being especially understood and agreed that the Sellers shall not be under any obligation to attempt to cure by litigation or otherwise any defect which may be found to exist in the title to the Premises or to remove any encumbrance upon the title to the Premises not voluntarily placed thereon by the Sellers or to correct any violations of subdivision, plat, building or minimum housing standard regulations or restrictions), at the option of the Buyers, the Deposit, together with all accrued interest, shall be refunded by Sellers to Buyers and thereupon all obligations of either party hereto shall be terminated upon such refund of the Deposit. Buyers would be deemed to waive any and all claim(s) or suit(s) against Sellers for other or further damages or specific performance of the Agreement if Buyers elect, however, to accept such title as Sellers are able to convey, without warranty as to known defects and without reduction of the Purchase Price.
 8.2. If Buyers shall default, the Sellers shall have the right to retain the deposit as liquidated damages, such right to be without prejudice to the right of the Sellers to require specific performance or the payment of other or further damages, including reasonable attorney's fees, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default."
The defendants assert that this paragraph manifests an intention of the parties to adopt the doctrine of merger by deed. The defendants alternatively argue that even if the promises contained in paragraph five of the Agreement do not merge with the deed, the plaintiffs have failed to show that the property as delivered breached paragraph eight of the Agreement.
The merger by deed doctrine dictates that
 "a warranty deed, once accepted, becomes the final statement of the agreement between the parties and nullifies all provisions of the purchase-and-sale agreement. Russo v. Cedrone, 118 R.I. 549, 557, 375 A.2d 906, 910 (1977). Absent a demonstration of fraud or misrepresentation, the warranty deed is the final embodiment of the agreement and conveys full rights to the property. Id. at 557-58, 375 A.2d at 910."
Deschane v. Greene, 495 A.2d 227, 229 (R.I. 1985).
Proper interpretation of a contract requires that the instrument be considered in its entirety. Johnson v. WesternNational Life Insurance Co., 641 A.2d 47, 48 (R.I. 1994). When the Agreement is so examined, the rational interpretation is that any violation of paragraph five discovered prior to the time of closing would provide the buyer with the remedy set forth in paragraph eight. This interpretation effectuates the language of the Agreement and is consistent with the merger doctrine. Accordingly, the court denies the plaintiffs' breach of contract action based on the Agreement where the closing has already occurred.[5]
Fraud
The plaintiffs next claim that the defendants committed fraud by making a series of misrepresentations with respect to the house. The defendants do not address this count specifically, concluding instead that it "relies on the same allegations regarding oral representations already dealt with." Defendants' Post-Trial Memorandum at 14. In dealing with the oral representation claims, the defendants claimed that the merger doctrine and the "as is" clause in the Agreement precluded recovery by the plaintiffs.
In order to constitute fraud, "[t]he general rule is that a misrepresentation should take the form of an expression of fact and not the offering of an opinion or estimate." St. Paul Fire Marine Insurance Co. v. Russo Brothers. Inc., 641 A.2d 1297, 1299 n. 2 (R.I. 1994). The plaintiff must also show that he or she was induced to act because of the reliance upon the alleged false representations. Id. Fraud may consist of either a spoken misrepresentation or silence in the face of a duty to speak. 37 Am.Jur.2d, Fraud and Deceit, § 2 (1968). Mere silence in the absence of a duty to speak is not fraudulent, however. McGinn v.McGinn, 50 R.I. 236, 240, 146 A. 636, 638 (1929).
Resolution of the plaintiffs' fraud claim thus involves a two-fold inquiry. First, whether the defendants had a duty to disclose their knowledge of the problems associated with the defective heating system, and second, whether the defendants made any affirmative misrepresentations to the plaintiffs about the heating system.
With respect to the first inquiry, the court concludes that the defendants had no duty to reveal the defects existing in the house. While full disclosure in residential real estate transactions is now required by statute in Rhode Island, R.I.G.L.see § 5-20.8-1 et seq, that statute was not yet enacted when the defendants sold their home to the plaintiffs.
The defendants place great reliance on the "as is" provision in the Exhibit D to the Agreement. Under that section of the Agreement, "[t]he buyers waive[d] an inspection of the structure, electrical system, mechanical system, plumbing and all appliances located in the buildings improvements situated on the Premises, and agree to purchase said Premises in the condition `as is.'" Defendants contend that this provision exonerates them from any liability, placing all risk on the plaintiffs.
It is well settled that "[t]he mere presence of an "as is" clause in the contract of sale will not prevent liability for fraudulent misrepresentation." Yzenbaard, Residential Real EstateTransactions, § 1.8 at 10 (1991); see also Friedman, supra,
§ 1.2 (n) at 52. Numerous cases have applied this rule and imposed liability on the seller for fraud. See. e.g., Ferguson v.Cussins, 713 S.W.2d 5, 6 (Ken. App. 1986) ("as is" clause does not preclude fraud claim); Wagner v. Cutler, 757 P.2d 779, 781-82 (Mont. 1988) (neither "as is" nor "independent investigation" clause prevented purchasers' claim for recovery where material misrepresentations made); George v. Lumbrazo, 584 N.Y.S.2d 704, 705 (App. Div. 1992) (inclusion of "as is" clause, even when coupled with merger clause in purchase and sale agreement, insufficient to prevent fraud claim); Brewer v. Brothers,611 N.E.2d 492, 495 (Ohio App. 1992) ("as is" clause no bar to fraud claim where buyer specifically asked about electrical system and was told "You have nothing to worry about"). Similarly, the presence of a merger clause will not bar a fraud action. Halpertv. Rosenthal, 107 R.I. 406, 416, 267 A.2d 730, 735 (1970);Bloomberg v. Pugh Bros. Co., 45 R.I. 360, 364, 121 A. 430, 431 (1923).
The plaintiffs have stated their claim as one for deceit, rather than an action for recision. As the court in Halpert noted
 "[t]he distinction between a claim for damages for intentional deceit and a claim for recision is well defined. Deceit is a tort action, and it requires some degree of culpability on the misrepresenter's part. (Citation omitted). An individual who sues in an action of deceit based on fraud has the burden of proving that the defendant in making the statements knew they were false and intended to deceive him."
Id. at 412, 267 A.2d at 733; see also Fleet National Bank v.Anchor Media Television. Inc., 45 F.3d 546, 554 (1st Cir. 1995) applying Rhode Island law).
The court finds that the only affirmative misrepresentations made by the defendants with knowledge of their falsity related to the heating system. Specifically, the representations made about the heating system on the fact sheet were made intending to induce reliance despite the defendants' knowledge of their falsity. However, the plaintiffs failed to introduce evidence that the defendants knew of defects existing in the roof, siding, and ventilation and insulation. Without such evidence, the rule of caveat emptor prevents the plaintiffs from recovering the costs of repairing those defects.[6] See McGovern v. Crossley,477 A.2d 101, 103 (R.I. 1984) (purchaser could not recover from vendor on deceit theory where misrepresentations concerning defects in house were not made with knowledge of their falsity);see also French v. Isham, 801 F. Supp. 913, 922-23 (D. R.I. 1992) (vendor not liable on fraud theory where vendor not deceitful concerning existence of structural defects).
Breach of Express Warranty
Plaintiffs' final claim for relief focuses on an alleged breach of express warranty made by the defendants. The plaintiffs allege that the defendants made express warranties:
 (a) through oral statements made to plaintiffs that defendants had resided in the dwelling house and that the heating system was in perfect operating condition, and adequate to heat the dwelling;
 (b) in writing that the heat set backs were operable by their inclusion as features of the radiant heating system as specified in a computer print out description . . . and that thereby the dwelling house could be heated with radiant heating energy efficiently with a savings in energy costs;
 (c) in paragraph 5 (b) of the [Purchase and Sale] Agreement in which it was written that the dwelling was "not in violation of any applicable . . . codes . . . standards, . . . including without limitation . . . building code["]; and
 (d) through additional representations to plaintiffs that the property was constructed under their design and supervision, to the highest standards, and was fit and proper for all purposes.
The defendants respond that plaintiffs cannot base a claim on oral warranties, for under the terms of the Purchase and Sale Agreement (the Agreement), "any warranties or representations not set forth or incorporated in th[e] Agreement or previously made in writing" are insufficient to create express warranties.[7]
While the plaintiffs appear to concede this fact in their post trial memorandum, they continue to argue that the representations made in the fact sheet constitute express warranties that survive the Agreement.
The court finds that any breach of warranty that may have occurred related solely to the heating system. The plaintiffs failed to meet their burden of proving that other defects in the property were expressly warranted by the defendants. Furthermore, the plaintiffs' attempt to base a warranty claim on paragraph five of the Agreement must fail in light of the merger doctrine previously discussed. Because the court has found for the plaintiffs on their fraud theory, any damages awarded on a breach of warranty theory would be duplicative.
Damages
While the plaintiffs ultimately chose to install a top-of-the-line heating system including air conditioning, the court finds that they may only recover those costs reasonably necessary to install a basic heating system sufficient to comply with the applicable codes. The court finds the testimony of the plaintiffs' experts to be persuasive on this issue and awards damages as follows:
 New Hot Water Heating System $60,000
 Carpentry for System $10,000
 Total $70,000
These damages may not be offset by the defendants against any amounts currently owed by the plaintiffs on the mortgage. G.L. 1956 (1985 Reenactment) § 9-20-4.1. The defendants must bring a separate action to recover any amounts due on that note.
Counsel shall prepare the appropriate order for entry.
[1] Mr. Israelit testified that the most basic heating system would have cost between $40,000 and $60,000.
[2] Hydro-Manufacturing involved the sale of commercial, rather than residential, real estate. 640 A.2d at 952. Nonetheless, the discussion of duties concerning the sale of commercial real estate was equally applicable to residential sales prior to 1992. Because the sale in the instant case took place before 1992,Hydro-Manufacturing's pronouncements are instructive.
[3] The plaintiffs' claim for breach of the implied warranty of fitness and breach of the implied warranty of merchantability are improper in the present context. These claims, while properly made in actions involving the sale of goods, are improperly asserted here. See Lacey v. Edgewood Home Builders, Inc.,446 A.2d 1017, 1019-20 (R.I. 1982) (protections afforded by UCC are inapplicable to sale of real estate).
[4] Plaintiffs urge the court to look to the law of Colorado as support for a finding that the defendants were "builder-vendors." As the defendants accurately point out, however, Colorado courts also require that the sale be commercial in nature prior to implying a warranty of habitability. See Mazurek v. Nielsen,599 P.2d 269, 271 (Colo. App. 1979).
[5] To the extent the plaintiffs argue that the defendants' fraud nullifies the merger doctrine, the court finds that the plaintiffs' claim sounds more properly in fraud.
[6] In the absence of fraud, the "as is" clause also operates to protect the defendants. See Kaminsky v. Kukuch,553 N.E.2d 868, 870-71 (Ind. App. 1990) ("as is" clause protected non-builder-vendor who did not know of toxic insulation).
[7] The defendants also argue that even if they were deemed to have created an express warranty, that warranty is of no effect due to the Agreement's "as is" clause. This contention is erroneous, however. See Olmsted v. Mulder, 863 P.2d 1355, 1359 (Wash. App. 1993) (presence of "as is" clause not effective to disclaim express warranty).