Margaret C. MILLER and E. Ross Miller, Administrators of the Estate of Elzie E. Miller, Deceased, and 4850 Oak, Inc., Appellants,

v.

Thomas J. HIGGINS and John Patrick Higgins and the First National Bank of Kansas City as Executors of the Estate of Anna Waters Higgins, a/k/a Anna W. Higgins, Deceased, Respondents.

No. 54128.

Supreme Court of Missouri, Division No. 2.

March 9, 1970.

Daniel S. Millman, Kansas City, for plaintiffs.

Hilary A. Bush, B. Kent Snapp, James L. Burgess, Johnson, Lucas, Bush & Snapp, Kansas City, for respondents.

MORGAN, Judge.

This action in two counts for fraud and breach of contract was tried to the court, and upon entry of judgment for defendants, the plaintiffs appealed. Jurisdiction is in this court by virtue of the damages sought exceeding the sum of $15,000. Sec. 477.040, V.A.M.S., Sec. 3, Art. V, 1945 Missouri Constitution, V.A.M.S.

The petition was filed July 25, 1956; trial was had November 6, 1963; judgment was entered April 25, 1968; and the case was submitted on appeal during the 1970 January Term. Such a delay can not be justified. However, we will attempt to reconstruct chronologically the history of this cause.

During the year 1949, defendant Thomas J. Higgins and others obtained a corporate charter for 4850 Oak, Inc. As reflected by the articles of incorporation, the sole corporate purpose was to construct an apartment complex in compliance with the rules and regulations of the Federal Housing Administration in order that guarantees of that agency would assure financing of the project. Sec. 608, Title VI of the National Housing Act (Sec. 1743, 12 U.S.C.A.), as amended. To obtain this benefit, many restrictive controls were placed with the agency, including ownership of all preferred corporate stock. Of particular interest here, as shown by the statute, agency rules and regulations and articles of incorporation, it was agreed that FHA would have absolute control of apartment rental rates. Prior approval of the agency was required for any increases in basic rent or charges for miscellaneous services provided. The power to enforce this right was specifically provided in that any violation authorized FHA, as holder of all preferred stock, to assume control of all corporate activities. All common stock (100 shares) became vested as follows: Anna W. Higgins—50 shares, Thomas J. Higgins—49 shares, and a brother of Thomas—1 share (subject to option of Thomas to purchase for one dollar). Title to the real estate was in the corporate name.

On February 3, 1954, Thomas and his mother, Anna W. Higgins, signed a contract to exchange the apartment complex for certain real estate of one Elzie R. Miller plus $15,000, conditioned on the resale of the Miller Property within 30 days for $60,000. After certain adjustments the sale was consummated. In consideration for the $75,000, all outstanding common stock of 4850 Oak, Inc. was to be assigned to Mr. Miller. It is agreed by all parties that on the date of the contract the mortgage indebtedness, guaranteed by FHA, was $146,925.56. The contract provided purchaser was to have an opportunity for his attorney and accountant to examine the corporation's books and records.

The contract resulted from the efforts of a realty agent and she scheduled the closing for April 22, 1954, in the offices of and under the supervision of an officer of the Kansas City Title Insurance Company.

Mr. Miller assumed ownership of the stock and control of the apartments. Approximately a year later, on March 31, 1955, he filed with FHA a required "Rental Housing Occupancy Report." It listed the rentals as 24 apartments at $89.00 per month each and two basement apartments at $75.00 each. He was immediately advised by FHA that $83.50 per month was the highest and only approved rent for each of the 24 units and that the two basement apartments had no rental basis and had never been approved for rental.

More disturbing, however, was the request " * * * that you immediately reimburse each tenant the amount in excess of the approved amount * * *." Such overcharges for refund amounted to $6,515.83 collected by the Higginses and $2,292.42 by Miller or a total of $8,808.25. Mr. Miller hired an attorney who advised Mr. Higgins of the FHA demands, and he, in turn, hired an attorney. The two attorneys cooperated in reviewing the problem with FHA, but it became apparent that the only way to solve the dilemma was to refinance the project. Mr. Miller obtained a new loan (at a net one-fourth higher interest rate), paid the original debt, repurchased the preferred stock from FHA, and abated the threatened takeover by the agency. FHA apparently withdrew its demand the refunds be made and left any recourse to each past or present tenant. The record does not indicate any such claims were made and we assume, at this late date, that all are barred by limitation. In any event, no refunds were made.

The petition in Count I charged defendants with having made material and fraudulent representations (1) that all rental rates had been approved by FHA, and (2) that the list of outstanding corporate debts was correct when, in fact, it did not list the $6,515.83 in refunds due tenants. Count II alleged failure to comply with promises to deliver corporate property—articles of incorporation, minute book, stock book, corporate seal, books and records.

At the trial, Mr. Miller testified sellers assured him rental agreements with FHA were in order; his then attorney, Collier A. Hizer, testified he had requested the FHA "rent registration" but approved of closing on sellers' assurance "they were in strict compliance with FHA regulations"; his accountant, Mr. Hassenpflug, stated, "They said the FHA rate was $89.00, even." For defendants, Mr. Higgins testified rental rates were not discussed at closing; and the closing agent, realtor and Higginses' bookkeeper could not recall any discussion of approved rates at time of clos-

ing. As to Count II, an explanation was given that corporate records at time of closing were with an attorney, then ill, and they were to be delivered later. Defendant Thomas J. Higgins' testimony included a statement he did not know that FHA had to approve added charges for additional services. He said FHA orally advised he could charge for extras without approval. However, reports he had signed emphasized the opposite. Defendants tendered a former employee of FHA, now with a realty company, as a witness. After an objection was sustained, an offer of proof was made that others had violated FHA rental regulations. Some seventy-four (74) exhibits are in evidence.

■ With the directly conflicting testimony reference whether or not there were express false representations at time of closing, questions of credibility were created which ordinarily require deference to the findings of the trial court. However, plaintiffs raise a very interesting doubt as to the degree of deference logically to be given when judgment is entered more than four years after trial. Fortunately no decision on this point is required as the documented record evidence, provided by the exhibits, resolves all doubts as to the proper judgment that should have been entered. Deference is not required when the controlling evidence is documentary. Meyers v. Smith, Mo., 375 S.W.2d 9, 13 [1]; Mo.Dig., Appeal and Error, ☞ 1008(3).

Did defendants know that all rentals, including charges for incidental services, had to be approved by FHA? Thomas J. Higgins had signed the original articles of incorporation which specifically provided: "The corporation shall not without prior approval * * * permit the occupancy of any of the dwelling accommodations * * * except at or below the rents fixed * * *" All reporting forms required emphasized this regulation, and he testified of discussing proposed increases with the agency. The answer must be that sellers

knew of such restrictive limitations and that the highest approved rent per apartment was $83.50. Were sellers complying with these known regulations? Copies of many individual tenant leases are in evidence clearly stating a monthly rental of $89.00. Were these overcharges reported to FHA? All exhibits indicate they were not. For instance, the report dated August 18, 1950, lists 24 apartments at $83.50 each with janitor use of the two basement apartments. Reports for 1951 were not offered. The reports to FHA for the years 1952 and 1953 (copied from agency records), certified by Mr. Higgins, reflect apartment rentals of $24,048 for each year. It is of interest and something more than a coincidence that $83.50 (authorized monthly rental) multiplied by 24 (apartment units) reflects a monthly rental income of $2,004. This amount multiplied by twelve months amounts to $24,048 for each year. The obvious answer is that the actual charge to each tenant of $89.00 per month was not being reported. The purchaser was not advised of these discrepancies, nor were any of the many corporate records reflecting this truth delivered or made available for examination as provided in the original contract of exchange.

■ Defendants argue that such non-disclosure of the truth must be classified as "implied warranties" and should not be considered as the petition was founded on the falsity of "express warranties." This point, factually, is debatable but in no event controlling. For throughout the entire trial, without objection by defendants, much evidence was offered that defendants intentionally suppressed and concealed the material fact that rentals charged had not been approved by non-delivery of corporate records. In fact, most of the trial related to this issue, as is evident from the admission of some seventy-four exhibits that did not tend to prove or disprove the charge Mr. Higgins expressly stated rental rates had been approved. Under such circumstances, the pleadings are considered as if amended to

conform to the evidence. Civil Rule 55.54, V.A.M.R., "Implied consent to the trial of issues not raised by the pleadings may be inferred from inaction or silence as well as from affirmative actions." Evett v. Corbin, Mo., 305 S.W.2d 469, 474 [5, 6].

■ Fraud is never to be presumed, however, " * * * fraud is seldom susceptible of proof by direct evidence, but must almost invariably be shown by circumstances surrounding the transaction from which the fraud of the one charged with its commission may be reasonably inferred." Salmon v. Brookshire, Mo.App., 301 S.W.2d 48; Jones v. Arnold, 359 Mo. 161, 221 S.W.2d 187. Silence or non-disclosure of a material fact, when used as an inducement to another, can be an act of fraud. Lindberg Cadillac Co. v. Aron, Mo.App., 371 S.W.2d 651; Security Savings Bank v. Kellems, 321 Mo. 1, 9 S.W.2d 967, 971 [8]; Metropolitan Paving Co. v. Brown-Crummer Inv. Co., 309 Mo. 638, 274 S.W. 815, 823 [22]. Rental income of an investment property is a very material fact. Finke v. Boyer, 331 Mo. 1242, 56 S.W.2d 372, 376. Even if it were assumed that FHA would have divulged records to a potential purchaser, his right to recover for fraud and deceit is not affected by failure to make an effort to check such records. Gamel v. Lewis, Mo.App., 373 S.W.2d 184, 192 [4]; Judd v. Walker, 215 Mo. 312, 114 S.W. 979, 980. He had every legal right to rely on sellers.

As to Count II, there is practically no dispute that promises to deliver later the seal and formal corporate records were broken.

■ With all of the elements of actionable fraud being shown, plaintiffs are entitled to recover on both Counts I and II with the only remaining question being the damages recoverable.

■ As to Count I, defendants contend that the proper measure of damages would be the difference between the actual value of the stock sold and its value if it had been

as represented, and that there was no proof of that difference. The proper and usual measure of damages is stated correctly, but the record proof clearly indicated what that amount would be. In addition to the accumulation of overcharges, that variance between a monthly rental of $83.50 and $89.00 on each apartment projected over the period remaining on the FHA controlled loan (17 years) would have exceeded $30,000. Had purchaser done nothing such damages would have been suffered and have been directly related to the value of the stock. By acting to avoid this loss by refinancing, purchaser avoided this damage, and by chance, also the repayment of overcharges. Is the victim of fraud to be penalized or denied any recovery when he is successful in mitigating the damage? We know of no authority so holding. A defrauded party may recover special damages necessarily incurred solely by reason of the fraud. Salmon v. Brookshire, Mo. App., 301 S.W.2d 48, 56; Brayton v. Gunby, Mo.App., 267 S.W. 450, 452 [6]; 37 C.J.S. Fraud § 141, p. 465. Such expenditures may properly include the professional aid of an attorney to mitigate damages and avoid future losses. Myers v. Adler, 188 Mo.App. 607, 176 S.W. 538; Boyles v. Burnett, 213 Mo.App. 288, 249 S.W. 719.

As to Count I, special damages proven were: Prepayment penalty to original mortgagee—$1,525; FHA prepayment penalty—$1,564; attorney fee—$1,850; accounting fees—$250; incidental refinancing expense—new survey, credit report, title insurance and recording fees—$421.85 or a total of $5,610.85. We deny the claim for $2,550 (increased interest obligation under the new loan) as being contingent and somewhat speculative because of prepayment privileges and the resulting freedom from restrictive rental controls.

As to Count II, expenses of reconstructing all corporate records, including an attorney fee of $250, amounted to $283.79.

All defendants participated, at least by their presence, in the closing transaction, and each is equally chargeable with nondisclosure of the material fact in issue and liable in damages to plaintiffs.

Mr. Miller, purchaser, and Mrs. Higgins, seller of one-half the stock, are both deceased and this is not a proper case for exemplary damages.

The judgment entered by the trial court is reversed and set aside, and the cause is remanded with directions to enter a new judgment in favor of plaintiffs on Count I in the sum of $5,610.85 and in favor of plaintiffs on Count II for $283.79, and that costs be assessed against defendants.

All of the Judges concur.