9 F.3d 1360
 22 UCC Rep.Serv.2d 525
 In re QUALITY PROCESSING, INC., Debtor.
HOLD-TRADE INTERNATIONAL, INC., International Grain Trade,
Inc., Rio Del Mar Foods, Inc., Plaintiffs-Appellants,
v.
ADAMS BANK AND TRUST, Defendant-Appellee.
 No. 92-2783.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1993.
Nov. 23, 1993.
 
 Bartholomew McLeay, Omaha, NE (argued), for plaintiffs-appellants.
 Steven Davidson, Omaha, NE (argued), for defendant-appellee.
 Before JOHN R. GIBSON, LOKEN, and HANSEN, Circuit Judges.
 LOKEN, Circuit Judge.
 
 
 1
 In this diversity case, plaintiffs Hold-Trade International, Inc., International Grain Trade, Inc., and Rio Del Mar Foods, Inc., appeal a judgment in favor of defendant Adams Bank & Trust ("Adams Bank"). Plaintiffs allege that Adams Bank wrongfully prevented its financially troubled customer, Quality Processing, Inc., ("Quality"), from performing contracts to deliver processed beans to plaintiffs. Following a bench trial, the bankruptcy court and the district court dismissed plaintiffs' Uniform Commercial Code and common law claims on the ground that no goods had been identified to plaintiffs' contracts with Quality at the time of Adams Bank's alleged misconduct. We reverse the dismissal of plaintiffs' tortious interference with contract claim and remand for a new trial on that claim. In all other respects, we affirm.
 
 I.
 
 2
 In early 1989, Quality constructed an edible bean processing plant in Ogallala, Nebraska, financed in part by loans from Adams Bank secured by Quality's equipment, machinery, inventory, and accounts receivable. Plaintiffs are commodities traders who entered into contracts with Quality to purchase approximately 13,000 100-pound bags of Great Northern beans for delivery after the harvest and processing of the 1989 crop.
 
 
 3
 The 1989 harvest began in late September, and the unprocessed beans were delivered to Quality by early December. Quality had insufficient cash flow to pay farmers for unprocessed beans before delivering processed beans to its customers. To meet this need, Adams Bank agreed to make a $415,000 "operational" loan secured by the same collateral as the prior borrowings. In addition, as is customary in the industry, Quality requested and received prepayments from some of its trader customers for the processed beans they had contracted to purchase. Plaintiffs paid Quality $244,000 for Great Northern beans they had not yet received. Quality advised Adams Bank of these prepayments as part of its explanation of how the Bank's $415,000 operational loan would be repaid in a relatively short time. Quality also advised Adams Bank that it would meet all its Great Northern contract commitments.
 
 
 4
 In late December, another of Quality's trader customers, Berger Co., requested expedited delivery of a large export contract. Though Berger had not prepaid, and Quality normally gave priority to customers who did, Quality elected to fill the Berger contract before delivering beans to plaintiffs. Quality informed plaintiffs of this decision.
 
 
 5
 In mid-January 1990, Quality officials advised Adams Bank that Quality's solvency was threatened by newly-discovered problems--a potential $1,500,000 liability on pinto bean futures contracts that Quality could not fill, and insufficient Great Northern beans to meet its contractual commitments. To reduce its exposure, Adams Bank requested and received authorization from Quality to apply all monies paid to Quality at the Bank to repay the operational loan.
 
 
 6
 The next day, the president of another major trader, Fitzgerald International, Inc., called Adams Bank after speaking to Quality about Fitzgerald's immediate need for processed Great Northern beans. The details of the Quality/Adams Bank/Fitzgerald discussions are shrouded in controversy, but what happened is undisputed. Fitzgerald paid Quality $89,000 for a prior shipment of beans, and that payment went to Adams Bank to reduce Quality's operational loan balance. Quality then filled Fitzgerald's request for 8400 bags of Great Northern beans on a priority basis, even though Fitzgerald had not prepaid this order and it exceeded Quality's inventory. Adams Bank approved or at least acknowledged this arrangement in writing to Fitzgerald and Quality.
 
 
 7
 By early February 1990, Quality had repaid its operational loan to Adams Bank. Quality remained in business but never filled plaintiffs' prepaid Great Northern bean contracts, despite their repeated demands for delivery. In mid-March, Quality filed for Chapter 11 bankruptcy protection. It could not successfully reorganize, leaving plaintiffs' claims under their prepaid contracts unsatisfied.
 
 
 8
 Invoking the bankruptcy court's related case jurisdiction, see 28 U.S.C. § 157(c)(2), plaintiffs filed this action to recover their losses from Adams Bank, arguing that the Bank prevented Quality from delivering Great Northern beans under plaintiffs' prepaid contracts. Plaintiffs' amended complaint alleged causes of action under §§ 2-722 and 9-307 of the Nebraska Uniform Commercial Code, Neb.Rev.Stat. §§ 90-2722, 90-9307.[1] On the eve of trial, however, plaintiffs moved to amend their complaint to assert four additional causes of action--restitution under UCC § 9-318, tortious interference with contractual relations, conversion, and unjust enrichment. Although Adams Bank objected that these theories would inject new fact issues into the case, the bankruptcy court granted this motion on the first day of trial.
 
 
 9
 Following a three-day bench trial, the bankruptcy court found that Quality, with plaintiffs' knowledge, unilaterally decided to fill the Berger contract first at a time when Quality believed it had enough beans to meet all its contractual commitments. However, the court found that Adams Bank played a significant role with respect to the subsequent Fitzgerald transaction:
 
 
 10
 The Bank officer was informed by [Quality] that the plaintiffs' contracts should be filled before Fitzgerald because the plaintiffs had prepaid and had requested delivery prior to Fitzgerald. The Bank officer was aware of the prepayment but directed [Quality] to fill the Fitzgerald contract anyway....
 
 
 11
 The officers of [Quality] followed the advice and direction of the Bank concerning the Fitzgerald contract because the officers believed it was important to bring in as much money as soon as possible to pay down the Bank debt. They felt the Bank held the purse strings and [Quality] could not operate without the Bank agreeing to the use of the funds.
 
 
 12
 Nevertheless, the bankruptcy court rejected all of plaintiffs' claims and entered judgment for Adams Bank. The court found that Quality never identified Great Northern beans to any of plaintiffs' contracts and concluded that, "[s]ince no beans were designated or identified to the contracts, the plaintiffs did not have a special interest in the beans which could be the basis for damage claims concerning the actions taken by the Bank."
 
 
 13
 Plaintiffs appealed to the district court. That court affirmed, concluding that the finding that no beans were identified to plaintiffs' contracts was not clearly erroneous; that plaintiffs' claims under UCC §§ 2-722, 9-307, and 9-318 required proof that beans be identified to the contracts; that the common law claims of conversion and unjust enrichment also required identification to the contract; and that plaintiffs' tortious interference claim should be dismissed because "if the beans cannot be identified as 'their' beans, Adams Bank cannot be said to have caused beans that would otherwise have gone to the traders to have been directed elsewhere."
 
 
 14
 Plaintiffs appeal, and we have jurisdiction under 28 U.S.C. § 158(d). On appeal, plaintiffs argue that the district court erred in concluding (i) that no beans were identified to their contracts; (ii) that plaintiffs failed to establish a claim for unjust enrichment; and (iii) that plaintiffs failed to prove tortious interference with contract. Like the district court, we review the bankruptcy court's legal conclusions de novo, but must uphold its findings of fact unless clearly erroneous. See In re Howell Enter., Inc., 934 F.2d 969, 971 (8th Cir.1991).
 
 
 15
 II. Identification.
 
 
 16
 Plaintiffs seek damages from Adams Bank for Quality's non-performance of its contracts with plaintiffs. UCC § 2-722 creates a cause of action against a third party to a contract, such as Adams Bank, who "so deals with goods which have been identified to a contract for sale as to cause actionable injury.... to a party to that contract [that has] a special property or an insurable interest in the goods." UCC § 2-501 provides that buyers, such as plaintiffs, have an insurable interest in goods, and therefore a cause of action under § 2-722, when the goods have been identified to the contract.
 
 
 17
 When the contract is for the sale of future goods, as in this case, identification occurs "when the goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." § 2-501(1)(b). Whether a seller has "designated" future goods to a particular contract is a fact intensive inquiry that turns upon the specific manner in which the seller conducts its business. See, e.g., Martin Marietta Corp. v. New Jersey Nat'l Bank, 612 F.2d 745 (3d Cir.1979). Plaintiffs contend that Quality identified Great Northern beans to their contracts when Quality invoiced specific quantities, plaintiffs prepaid those invoices and submitted shipping instructions, and Quality scheduled plaintiffs' contracts for processing and in one case issued a "Certificate of Entitlement" to plaintiff Rio Del Mar.
 
 
 18
 Much of the trial testimony addressed this issue. The bankruptcy court found that Quality's "[d]esignation of beans to particular contracts took place at the time of processing particular beans for a particular customer and making delivery arrangements." The court credited the testimony of Quality's Operations Manager and President that Quality did not designate beans to particular contracts prior to processing, even in the case of prepaying buyers, and never designated specific beans to plaintiffs' contracts. Though plaintiffs stressed the testimony of Quality's founder, Joseph Hrcka, that Quality had "designated a certain quantity of Beans located in a certain location in the plant" to plaintiffs' contracts, the court found that "the contrary evidence is more convincing." In addition, the court found that Quality only issued the one Certificate of Entitlement and its significance was not explained.
 
 
 19
 We give great deference to the bankruptcy court's findings, particularly those that turn upon the credibility of conflicting witnesses. See In re LeMaire, 898 F.2d 1346, 1349 (8th Cir.1990) (en banc). After careful review of the record, we agree with the district court that the bankruptcy court's finding regarding identification was based upon a proper interpretation of the Nebraska UCC and was not clearly erroneous. Because plaintiffs pleaded identification as a prerequisite to recovery under their UCC and conversion claims, the judgment dismissing those claims must be affirmed.
 
 
 20
 Plaintiffs also argue that the district court erred in dismissing their claim for unjust enrichment because Adams Bank enjoyed a double recovery at plaintiffs' expense, regardless of whether beans were identified to their contracts. However, even if Adams Bank reaped a double recovery (which we doubt), plaintiffs may not recover under an unjust enrichment theory unless "their" beans were sold twice. Thus, we agree with the district court that failure to prove identification to the contracts defeats this claim as well.
 
 
 21
 III. Intentional Interference With Contract.
 
 
 22
 To recover for intentional interference with contract under Nebraska law, a plaintiff must establish a valid contract known to the defendant, and an unjustified and intentional interference with that contract causing damage to the plaintiff. See Matheson v. Stork, 239 Neb. 547, 477 N.W.2d 156, 160 (1991); Triple R Indus., Inc. v. Century Lubricating Oils, Inc., 912 F.2d 234, 236 (8th Cir.1990). In their second amended complaint, plaintiffs alleged that Adams Bank interfered with their contracts by causing Quality not to deliver Great Northern beans to plaintiffs despite the Bank's knowledge that plaintiffs had prepaid. Plaintiffs argue that they proved actionable interference under Nebraska law.
 
 
 23
 Abandoning the reasoning of the bankruptcy court and the district court, Adams Bank responds by arguing that the common law tort of interference with contract is entirely preempted by UCC § 2-722. We disagree. The concept of identification of goods to a contract has a limited purpose under the UCC--to provide buyers of goods with a statutory indicium of insurable interest that is commercially preferable to the common law's dependence upon passage of title. See § 2-501, Official Comment. Consistent with this limited purpose, § 2-722 is intended primarily to allow buyers to sue third parties, such as bailees, for physical damage to identified goods. See § 2-722, Official Comment; Mitsui & Co. v. Hudson Tank Terminals Corp., 790 F.2d 226 (2d Cir.1986). In the absence of a clear legislative intent to preempt, UCC remedies merely supplement common law remedies. See UCC § 1-103; Cass Constr. Co. v. Brennan, 222 Neb. 69, 382 N.W.2d 313 (1986). Given the narrow scope of the remedy created by § 2-722, we will not infer an intent to preempt in its entirety the much broader common law tort of interference with contract. The tort of interference with contract potentially applies to a myriad of business situations, and we are not prepared to say that a buyer of goods under a contract that is governed by Article 2 of the UCC may never recover for tortious interference unless goods have been identified to the contract.
 
 
 24
 The bankruptcy court dismissed plaintiffs' tortious interference claim on the ground that it was "based upon plaintiffs having some interest in [Quality's] inventory which would give plaintiffs a claim in the inventory superior to that of the Bank, a secured creditor." Although plaintiffs may have stressed the identification issue in their proof at trial, their Second Amended Complaint was not so limited. Plaintiffs alleged that Adams Bank tortiously interfered with "contracts and valid business relationships between Quality" and plaintiffs, which includes whatever legitimate contract or business expectancies arose out of plaintiffs' prepayment of their contracts to purchase. The bankruptcy court erred in dismissing the tortious interference claim without addressing this aspect of the claim in its findings and conclusions.
 
 
 25
 Taking a different path to the same result, the district court in affirming held that any interference by Adams Bank did not cause plaintiffs' damages because Quality never identified beans to plaintiffs' contracts. Although causation is an element of tortious interference, we conclude that the district court took too narrow a view of the causation issue. There was conflicting evidence on the question whether Quality would have delivered beans to plaintiffs had Adams Bank not interfered by supporting Fitzgerald's request for preferential treatment. The bankruptcy court made no finding on this causation issue, and the district court erred in assuming that the answer must turn, as a matter of law, on the UCC identification question.
 
 
 26
 Adams Bank further argues that plaintiffs' tortious interference claim was properly dismissed because plaintiffs failed to prove that Adams Bank intentionally and improperly interfered with plaintiffs' contract rights when it acted to protect and enforce its "legitimate and legally enforceable rights which it possessed by virtue of its position as Quality's secured creditor." We agree that these are legitimate fact issues, but given the bankruptcy court's findings regarding Adams Bank's involvement in the Quality/Fitzgerald transaction (see page 1363, supra ), we cannot conclude as a matter of law that the evidence was insufficient to support plaintiffs' tortious interference claim.
 
 
 27
 Turning to the question of relief, plaintiffs argue that the bankruptcy court's findings establish all the elements of tortious interference, so that they are entitled to judgment on that claim as a matter of law. We disagree. As noted above, the bankruptcy court made no finding with respect to causation, and the evidence at trial was clearly in conflict on that issue.
 
 
 28
 In addition, the Supreme Court of Nebraska has recently emphasized that only an "unjustified" interference with contract is actionable. Matheson, 477 N.W.2d at 160. A party is justified in interfering with a third party's contract if it "asserts in good faith a legally protected interest of its own ... if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts § 773; see Langeland v. Farmers State Bank, 319 N.W.2d 26, 33 (Minn.1982) (no liability for actions "in furtherance of a superior legal right"). Generally speaking, a secured party is justified in interfering to protect a superior security interest. See Caven v. American Fed. Sav. & Loan Assoc., 837 F.2d 427, 432 (10th Cir.1988); Ford v. C.E. Wilson & Co., 129 F.2d 614, 617 (2d Cir.1942); In re Ashby Enter., 47 B.R. 394, 397 (D.D.C.1985); Langeland, 319 N.W.2d at 32-33. See also Spencer Cos. v. Chase Manhattan Bank, 81 B.R. 194, 204 (D.Mass.1987) (no improper intent to interfere when secured party acted to protect its secured position). Adams Bank was therefore entitled, or privileged as the tort law authorities sometimes state, to advise Quality as to its business affairs and to protect the Bank's own interests as secured creditor so long as it did not interfere with superior rights of third parties such as plaintiffs. See Restatement (Second) of Torts § 767 & Comment e., f.; § 769 & Comment b.; Nitzberg v. Zalesky, 370 So.2d 389, 391-92 (Fla.App.1979). The trial record is largely silent on the issue of justification, and the bankruptcy court certainly made no findings of fact on that issue.
 
 
 29
 In these circumstances, the trial record and the bankruptcy court's findings do not permit us to resolve plaintiffs' tortious interference claim in favor of any party as a matter of law. Having concluded that the bankruptcy court and the district court erred in dismissing that claim, the judgment of the district court is reversed and the case is remanded for a new trial on plaintiffs' tortious interference with contract claim. In all other respects, the judgment of the district court is affirmed.
 
 
 
 [1]
 Subsequent citations will be by UCC code section, since Chapter 90 of the Nebraska Revised Statutes mirrors the UCC