United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4043

_____

In re: Mary Beth Usery,               *
                                                   *

        Debtor.                  *
                                                 *

------------------------------------- *
                                                 *

Ewing B. Gourley; Carol L. Gourley,  *
                                               *

      Plaintiffs-Appellees,    *

                                               * Appeal from the United States
     v.                     * District Court for the Western
                                             * District of Missouri.

Mary Beth Usery; Steven Usery; James *
McLeod, Trustee,               *
                                               *

      Defendants-Appellants,   *
                                               *

Fred C. Moon, Trustee of the Estate of *
Mary Beth Usery,              *
                                             *

      Appellant.             *
                                             *

------------------------------------- *
                                               *

Mary Beth Usery; Steven Usery; James *
McLeod, Trustee of the Shawn Usery   *
Trust and the Stephanie Usery Trust,  *
                                             *

      Plaintiffs-Appellants,    *
                                             *

William Hart, Trustee Under Certain   *

Deeds of Trust,                         *
                                        *
            Plaintiff,                  *
                                        *
      v.                                *
                                        *
Ewing B. Gourley; Carol L. Gourley;     *
E.B.G. Health Care III, Inc.; E.B.G.    *
Health Care IV, Inc.; Health Care       *
Retirement Village, Inc.; Health Care   *
Laundry Services, Inc.,                 *
                                        *
            Defendants-Appellees.       *

_____

Submitted:  June 9, 1997
Filed:   August 22, 1997

_____

Before BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and KYLE,[1] District Judge.

_____

BOWMAN, Circuit Judge.

This adversary proceeding arises out of a nursing home sale tainted by fraud. The Bankruptcy Court awarded the purchasers, Ewing and Carol Gourley, more than $5.4 million in damages resulting from the fraudulent representations of the sellers, Mary Beth and Steven Usery. The Userys appealed to the District Court, which affirmed. We now affirm as to liability but reverse and remand for a new trial on damages.

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

## I.

In 1988, Mary Beth Usery owned a majority interest in Central Health Care Centers, Inc. (CHCC). The remaining equity in the company was owned by Mary Beth's then-husband Steven and by trusts benefitting their children. Through CHCC, the Userys owned and operated two nursing homes in Springfield, Missouri, known as Northside Nursing Center (Northside) and Ozark Nursing and Care Center (Ozark); an apartment complex; and a laundry facility. The Userys had operated the nursing homes profitably for a number of years and had withdrawn large amounts of cash from CHCC to support their lavish lifestyle. Steven's management of the homes, and particularly his reduction in staffing levels in 1987, eventually caused trouble: a March 1988 inspection of Northside by the Missouri Division of Aging revealed serious deficiencies in patient care, and CHCC had to enter into a consent agreement with the Division in order to retain its license. The agreement froze Medicaid admissions, required Northside to increase staffing levels, and gave the home until July 1989 to fix its problems or shut down.

In late 1988, the Userys, who were beginning divorce proceedings, decided to sell the homes rather than attempt to continue operating them. Through their accountant, Judy Breeding (who was also a director of CHCC), they met Ewing Gourley, who was well-known in Missouri as a successful manager of nursing homes. Breeding had done accounting work for Gourley in his business and in his then-pending divorce. Gourley eventually expressed interest in leasing the nursing homes from CHCC with an option to purchase, but Mary Beth insisted on selling the properties outright.

At a key meeting on March 10, 1989, the deal came together. Gourley explained to the Userys that his assets were tied up because of continuing litigation relating to his divorce. See Gourley v. Gourley (In re Marriage of Gourley), 811 S.W.2d 13 (Mo. Ct. App. 1991). He emphasized that he could afford to buy the homes only if they

-3-

produced sufficient cash flow to allow him to service existing debt and to pay the Userys for the sale. The Userys and Breeding (who is not a party to this case) assured Gourley that, even though 1988 financial results were not yet available, the homes' cash flow in 1988 was substantially the same as the 1987 cash flow, which the Userys and Breeding calculated to be approximately $960,000 after service of existing debt. In fact, the Userys had preliminary 1988 financial records available at the time that showed a significantly lower cash flow. Gourley later discovered these records in a cardboard box at Northside.

As the parties began to structure their deal, the Userys made two other significant misrepresentations. When Gourley inquired about accounts payable, he was told that they totaled about $75,000 and were current. After the sale, Gourley discovered that the Userys had been keeping two sets of books and that payables actually exceeded $500,000, including many delinquent accounts. The resulting drain on cash was exacerbated by Mary Beth's insistence, before the closing, on drawing down half of a $500,000 line of credit established especially for the transition. The Userys also represented that all of the long-term debt that Gourley agreed to assume was business-related debt. In fact, the long-term debt included loans totaling $110,000 that Steven had obtained through CHCC for personal purposes, as well as a debt of $18,000 owed by the Userys to Breeding for personal tax advice.

Based on the Userys' representations, Gourley and his new wife, Carol, agreed to purchase Northside, Ozark, the apartments, and the laundry facility for a total price of $8 million. The Gourleys assumed $4.1 million in long-term debt of CHCC, and they gave the Userys a note, payable over twenty years, for the balance. As the deal was structured, the amount of the note was to be adjusted after the closing to account for the difference between payables and Medicaid receivables, but this "net-out" transaction never took place. Although the Gourleys were able to get Northside out from under the consent agreement with the state, they ran into operational difficulties immediately after taking over the homes, and they had to invest substantial amounts of

their own money in order to keep the businesses afloat. After a series of negotiations between the parties failed, the Gourleys stopped making payments on the note because of a shortage of cash.[2] Because the note was Mary Beth's primary source of income, she filed for Chapter 11 bankruptcy in February 1992.

In bankruptcy court, the Gourleys filed an adversary proceeding against the Userys, alleging that the Userys' fraud rendered the note void and unenforceable. Mary Beth filed an adversary proceeding against the Gourleys to collect the balance due on the note; Steven and the trustee of the Usery children's trusts intervened and joined in Mary Beth's complaint. The Bankruptcy Court consolidated the actions and conducted a bench trial, none of the parties having demanded a jury. After a thirteen-day trial, the court announced findings and conclusions from the bench, ruling in favor of the Gourleys and awarding approximately $2.2 million in damages, subject to further calculations. At the same time, the court converted Mary Beth's bankruptcy to a Chapter 7 liquidation.

More than two years later, the court filed a written memorandum opinion awarding the Gourleys more than $5.4 million in damages. The primary reason for the increase in damages over the original figure was the inclusion in the final judgment of general damages for the misrepresentation of the cash flow, discussed in more detail later in this opinion. Because the Gourleys' damages exceeded the balance of the note, the court declared the note satisfied and entered the excess as a judgment against the Userys. The court also denied Mary Beth a discharge of her debt to the Gourleys.

The Userys, joined by the trustee of Mary Beth's bankruptcy estate, appealed to the District Court, which affirmed.

---

[2]At one point, the Gourleys paid Mary Beth $23,000 over and above the amount then due because she claimed she needed cash. Although she promised to credit this amount against the balance of the note, she never did.

## II.

As the second court of appeal in a bankruptcy case, we apply the same standard of review as the District Court, reviewing the Bankruptcy Court's legal conclusions de novo and its findings of fact for clear error.  See First Nat'l Bank v. Pontow, 111 F.3d 604, 609 (8th Cir. 1997); Hold-Trade Int'l, Inc. v. Adams Bank & Trust (In re Quality Processing, Inc.), 9 F.3d 1360, 1363 (8th Cir. 1993).  Reversal is appropriate if the Bankruptcy Court misunderstood or misapplied the law.  See Nangle v. Lauer (In re Lauer), 98 F.3d 378, 383-85 (8th Cir. 1996); Hold-Trade Int'l, 9 F.3d at 1364-66.

## III.

The Userys first take issue with the Bankruptcy Court's findings that they defrauded the Gourleys.  The court found specifically that the Userys made three material misrepresentations; as explained above, these misstatements concerned cash flow, accounts payable, and the relationship of the debts assumed to the businesses the Gourleys purchased.

The parties agree that Missouri law applies to this case.  A claim of fraud under Missouri law requires the plaintiff to show nine elements:

> 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity, or his ignorance of its truth; 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) the hearer's reliance on the representation being true; 8) his right to rely thereon; and, 9) the hearer's consequent and proximately caused injury.

Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo. 1988) (en banc).  We are satisfied that the Bankruptcy Court's findings of fact on the issue of liability are not clearly

erroneous, and we have no quarrel with the court's legal conclusions on this issue. Because a detailed discussion will add little to the body of Missouri law on fraud, we affirm as to liability on the basis of the Bankruptcy Court's thorough and well-reasoned opinion.[3]

## IV.

As to the calculation of damages, however, we believe that the Bankruptcy Court erred in several respects. We consider general damages first, followed by particular items of special damages.

## A.

In Missouri, a victim of fraud has two options: rescission of the transaction, which permits the victim to return any benefits received from and to recover benefits conferred on the perpetrator, or affirmance of the transaction, which permits the victim to recover damages. See Rosenblum v. Jacks or Better of Am. W. Inc., 745 S.W.2d 754, 764 (Mo. Ct. App. 1988). The Gourleys have chosen the latter option. In such a case, damages are measured by the "benefit of the bargain" rule, which allows the victim to recover "the difference between the actual value of the property and what its value would have been if [the property] had been as represented." Heberer, 744 S.W.2d at 443. Courts have articulated this standard in slightly varying language. See Blue v. Rose, 786 F.2d 349, 352 (8th Cir. 1986) (applying Missouri law) ("the difference between the actual value of the purchased property and its value had it been as represented"); Rosenblum, 745 S.W.2d at 764 ("the difference in value between what [the victim] actually received and what he would have received had there been no fraud"). Regardless of the particular wording, however, the purpose of the rule is to

---

[3]We also reject without further discussion the Userys' argument that the Gourleys waived their fraud claim.

compensate the victim for the harm caused by the defendant's fraudulent representations.  See Heberer, 744 S.W.2d at 443-44.  Damages are measured as of the time of the transaction.  See Auffenberg v. Hafley, 457 S.W.2d 929, 937 (Mo. Ct. App. 1970).

The Bankruptcy Court adopted the testimony of the Gourleys' expert as to the actual value of the nursing homes.  That expert determined a value for each home by applying a capitalization rate (16.9% for Ozark, 18.7% for Northside because of the increased risk posed by the consent agreement) to each home's average cash flow for the years 1985, 1986, and 1988.  The abnormally large cash flow in 1987 was excluded as not representative of the performance of the homes.  Using this method, the expert determined that the two homes together were worth $5,175,000 at the time of the sale.  The Bankruptcy Court then subtracted this figure from the purchase price of $8 million and determined that the Gourleys' general damages were $2,825,000.

We perceive two errors in the Bankruptcy Court's calculation.  First, the court neglected to account for the apartment complex and the laundry facility, which were included in the $8 million total price but not in the expert's valuation.  This omission resulted in an overstatement of damages by perhaps $800,000 (a figure used by Gourley in his testimony regarding the value of the apartment complex and the laundry facility).  Second, and more fundamentally, the court confused the price the Gourleys actually paid for the Userys' businesses ($8 million) with the value those businesses would have had if the Userys' representations had been true (an amount that we cannot determine definitively on appeal, but that is probably less than $8 million).  Because a purchaser may pay more or less for a business than the business is actually worth (and more or less than the business would be worth if the seller's fraudulent statements were true), the sale price is not necessarily equivalent to the value of the business "had it been as represented."  Blue, 786 F.2d at 352.  The Gourleys undoubtedly paid more for the nursing homes than the homes were worth, but the record and the testimony of the Gourleys' own expert suggest that they did so for two reasons:  the Userys'

misrepresentations and the Gourleys' bad judgment. The purpose of a fraud lawsuit is to compensate the victim for the effects of the defendant's misrepresentations, not to save the victim from his or her own unwarranted optimism about the viability of a business. If, for example, the Gourleys had agreed to pay $18 million for the businesses because they believed that they could make phenomenal profits, they would have lost $10 million more than they actually did, but they would not be entitled to collect an additional $10 million from the Userys. The extra $10 million would have been a product of the Gourleys' folly, not a consequence of the Userys' fraud.

Principles of causation and damages are equally relevant in this situation. Any harm resulting from expectations that are overly optimistic even in light of the defendant's fraudulent statements is not a "natural and probable consequence" of the defendant's fraud. Heberer, 744 S.W.2d at 444. Similarly, the goal of the benefit-of-the-bargain rule is to restore the plaintiff to the position in which he or she would have been in the absence of fraud. If the bargain would have been unprofitable even in the absence of fraud, the plaintiff must accept the bad bargain or else sue for rescission instead of damages. For these reasons, the benefit-of-the-bargain rule focuses on the value of the property as represented and its actual value, and the courts generally disregard the contract price. See DeBow v. Higgins, 425 S.W.2d 135, 142-43 (Mo. 1968) (accepting expert's valuation of property as represented as $32,600--less than purchase price--but remanding for new trial because of uncertainty as to actual value); Klecker v. Sutton, 523 S.W.2d 558, 564 (Mo. Ct. App. 1975) (recognizing that nothing in record supported plaintiff's theory that sale price was equivalent to value of property as represented).

On occasion, Missouri courts will use the contract price as a proxy for the value of the property as represented, at least where no other evidence of value is presented. See, e.g., Smith v. Tracy, 372 S.W.2d 925, 939 (Mo. 1963). This method of calculation is inappropriate in the instant case, however, because the $8 million and $5,175,000 figures reflect different assumptions. In valuing a business, it is customary

to extrapolate from income figures to a valuation figure by using a capitalization rate reflecting the risk inherent in the market and the business.[4]  As we have noted, the Gourleys' expert did just this to calculate the actual value of the nursing homes; his capitalization rates were 16.9% and 18.7%.  But if we examine the $8 million purchase price in light of the cash flow figures as the Gourleys believed them to be (i.e., the fraudulent figures), the purchase price reflects an effective capitalization rate of approximately 12% for the whole package.  A factfinder cannot compare figures derived from different capitalization rates (and therefore different risk assumptions) to determine the damages attributable to fraud, because part of the difference will be due to the change in risk perception and not due to the fraud at all.

On remand, the Bankruptcy Court must determine the difference between the actual value of the nursing homes and the value of the homes as represented, using the same capitalization rate for each part of the equation.  In other words, the court must use the same process to calculate both valuation figures, changing only the cash-flow numbers.  Because valuation is a subjective art, we are unable to make a specific finding as to damages on appeal, but we note that each of the illustrative calculations we have undertaken, including the example presented in the Userys' reply brief, has yielded benefit-of-the-bargain damages of less than $600,000.

---

[4]We reject as frivolous the Userys' argument that the contract represented only a sale of assets and not a sale of ongoing businesses.  Regardless of the caption of the agreement, it is clear from the content that the Gourleys were purchasing the businesses as going concerns.  See Chambers v. McNair, 692 S.W.2d 320, 323-24 (Mo. Ct. App. 1985) (interpreting contract for sale of inventory and fixtures as contract for sale of business).

**B.**

The Bankruptcy Court also awarded damages flowing directly from the Userys' other misrepresentations, those concerning accounts payable and the source of the debts assumed by the Gourleys.

The court calculated that accounts payable totaled $538,417.19, not $75,000, as the Userys had represented. The Userys have given us no reason to question the District Court's calculation. The court properly awarded the Gourleys the difference between the actual accounts payable and the Medicare receivables (which were $236,681.79), for net damages of $301,735.40. Contrary to the Userys' arguments, they are not entitled to a credit of $75,000 against this figure. It is true that the Userys disclosed that the homes were carrying $75,000 in payables, and so this amount is not, strictly speaking, damages caused by fraud. Nevertheless, the Userys agreed to net out the receivables and payables after the sale, and they never did so. If the Userys wish the court to enforce their contractual right to the benefit of the Medicare receivables, they must permit the Gourleys to recover the amount to which they are contractually entitled. The Bankruptcy Court's award of the net payables to the Gourleys was not clearly erroneous.

We are less comfortable with the court's award of damages in the amount of the non-business-related debts assumed by the Gourleys. With regard to the $110,000 in loans taken out by Steven Usery for personal reasons, we note that these loans were disclosed clearly in the purchase agreement as debts to be assumed by the Gourleys. The Gourleys therefore received a credit of $110,000 against their note to the Userys in exchange for assuming these loans. If the Gourleys had known that these loans were not business-related, we have no doubt that they would not have assumed the loans. In that case, however, the Gourleys would have owed the Userys an additional $110,000 on the purchase-money note, because they had already agreed to pay a total of $8 million for the businesses. The Gourleys' damages thus were not $110,000,

because the Gourleys would have owed someone $110,000 in any event. Rather, their damages must be measured by the difference between the cost of paying the bank $110,000 according to the terms of the loans and the cost of paying the Userys $110,000 over the twenty-year term of the purchase-money note. Accordingly, the Bankruptcy Court's award of $110,000 in damages was clearly erroneous.

We are unsure how to handle the $18,000 debt owed to Breeding that the Gourleys unwittingly assumed, because we are unable to uncover any evidence of this debt in the record, and the parties have done nothing to assist us in doing so. The debt is not apparent among those specifically assumed by the Gourleys in the sale agreement, and if it is among the accounts payable, the Gourleys have received damages for it already. If, as the Bankruptcy Court's memorandum opinion seems to suggest, the Breeding debt surfaced after the sale and the Gourleys felt compelled to acknowledge the debt because they required Breeding's accounting services, it is not at all clear that the Gourleys' recourse is properly against the Userys. Without any assistance from the parties, we are unable to reach a more definite conclusion, and so we leave this issue for the court's further consideration on remand.

## C.

Finally, we consider the Bankruptcy Court's award of special damages. Under Missouri law, "[a] defrauded party may recover special damages necessarily incurred solely by reason of the fraud." Miller v. Higgins, 452 S.W.2d 121, 125 (Mo. 1970). Special damages (in contract terms, incidental and consequential damages) are awarded in addition to benefit-of-the-bargain damages. See Blue, 786 F.2d at 352; Chambers, 692 S.W.2d at 325.

Most of the $2.3 million in consequential damages awarded by the court related to additional funds that the Gourleys had to plow into the businesses to keep them viable. The Gourleys set up each of the businesses in corporate form, and the

corporations took out hundreds of thousands of dollars in loans, secured by personal guaranties from the Gourleys. The Gourleys, as shareholders, also loaned significant amounts to the corporations. The Bankruptcy Court's award of special damages included four components: the principal amounts of the bank loans and shareholder loans (about $1.8 million), interest paid on the bank loans (about $430,000), interest foregone on the shareholder loans (about $12,000), and the money the Gourleys paid to Mary Beth that never was credited against the note ($23,000).

As the Userys argue, the causation issue we have discussed previously with respect to the benefit-of-the-bargain damages also affects consequential damages. Special damages are recoverable only if they are "incurred solely by reason of the fraud." Miller, 452 S.W.2d at 125. As with general damages, it appears that some of the Gourleys' need for additional capital was caused by the Userys' misrepresentations and some was caused by the Gourleys' overly optimistic projections of what they could do with the nursing homes. We have no basis for resolving this difficulty on appeal, and so this issue also must be considered on remand.

The Userys argue further that some of the loans included in the award of special damages are double-counted because these loans in reality were obtained only to refinance the loans the Gourleys assumed as part of the purchase or to pay off other loans that also have been counted as special damages. The Userys may well be correct, though the record on appeal leaves us somewhat less than certain.[5] We are more concerned, however, with another form of double-counting that surfaces occasionally among the Userys' arguments: the special damages appear to cover much of the same ground as the benefit-of-the-bargain damages for the cash-flow misrepresentation. The

_____

[5]The Gourleys' attempt to support the award of special damages by means of alternative calculations is nearly incomprehensible and is based on numerous exhibits that the Gourleys have not included in the appellate record. We therefore find the argument particularly unpersuasive, and we leave this double-counting argument as yet another issue for plenary consideration on remand.

Gourleys' theory of special damages was that they had to invest large amounts of money in order to make the businesses profitable, as the Userys represented they were. The purpose of the benefit-of-the-bargain damages, however, is also to ensure that the Gourleys get businesses that are as valuable as the Userys stated they were. The Gourleys cannot recover for what is essentially the same loss under two different theories; general damages and special damages must represent distinct injuries. See, e.g., Blue, 786 F.2d at 352 (allowing difference between represented value and actual value of cattle as general damages, and costs related to purchasing and caring for cattle until resale as special damages); Miller, 452 S.W.2d at 124-25 (allowing difference between represented value and actual value of stock as general damages, and prepayment penalties, attorney fees, and refinancing expenses as special damages); Hanes v. Twin Gable Farm, Inc., 714 S.W.2d 667, 668-72 (Mo. Ct. App. 1986) (allowing difference between represented value and actual value of bull as general damages, and loss resulting from bull's failure to beget calves as consequential damages). On remand, the Bankruptcy Court should give due regard to limiting the Gourleys to only a single recovery for the cash-flow misrepresentation.[6]

We need not consider the Userys' claim that the Gourleys may not recover special damages that arose after the Gourleys discovered the fraud. It is not clear that Missouri bars the recovery of special damages arising after the victim discovers he or she has been defrauded, the only support for such a rule coming in unexplained comments of the Missouri Court of Appeals some years ago. See Salmon v. Brookshire, 301 S.W.2d 48, 56 (Mo. Ct. App. 1957) (opinion on motion for rehearing) ("This record does not contain any evidence of special damages, not speculative in nature, that occurred prior to plaintiff's discovery of the alleged fraud and which would

_____

[6]We take care to point out that the Userys' misrepresentation regarding accounts payable may be a proper subject of special damages. It is clear from the record that the large total of undisclosed overdue payables hampered the Gourleys' operation of the homes significantly by draining the homes of cash necessary for operations. Any such losses proved by the Gourleys on remand would be recoverable as special damages.

be the proper basis of an instruction . . . ."); <u>Blackmore v. Sisson</u>, 139 S.W.2d 1084, 1096 (Mo. Ct. App. 1940) ("In fraud cases computation of damages is as a rule fixed as of the date fraud is discovered."). Even in states where it is settled that the law prohibits recovery of consequential damages arising after the fraud is discovered, the theory is that a party to an executory contract who discovers fraud may not go forward and compound the damages, but instead must terminate the relationship and sue for damages at that point. <u>See</u> <u>Clements Auto Co. v. Service Bureau Corp.</u>, 444 F.2d 169, 184 (8th Cir. 1971) (applying Minnesota law).[7] Where termination would be "economically unreasonable," the victim may be able to recover further damages. <u>Id.</u> It is enough for present purposes that we recognize that it is not clear from the record whether the Gourleys would have been able to rescind the agreement fully once they discovered the fraud, because the Gourleys had assumed the Userys' loans and had undertaken other commitments to other lenders and the state. In any event, it may turn out that when the Bankruptcy Court recalculates special damages, none of the damages properly recoverable will be damages arising after the fraud was discovered, and the issue will be moot. If the issue remains live on remand, the Bankruptcy Court will be in the best position to apply Missouri law to the facts.

## V.

Because of several errors in the calculation of damages, a new trial limited to the issue of damages is required. The judgment of the District Court is affirmed as to liability and reversed as to damages, and the case is remanded with instructions to remand to the Bankruptcy Court for further proceedings in accordance with this opinion.

---

[7]The Userys' citation of <u>Clements</u> as though it were a case applying Missouri law is not well taken.

-16-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.